40

[No. F057211. Fifth Dist. Nov. 16, 2010.]

BRENTON R. SMITH et al., Plaintiffs and Respondents, v.
ADVENTIST HEALTH SYSTEM/WEST et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.C.1., 2., 3., 4., and IV. of the Discussion

**42**

Counsel

Manatt, Phelps & Phillips, Barry S. Landsberg, Doreen W. Shenfeld and Joanna S. McCallum for Defendants and Appellants.

Andrews & Hensleigh, Barbara J. Hensleigh and John Aumer for Plaintiffs and Respondents.

OPINION

DAWSON, J.—

## INTRODUCTION

Brenton R. Smith, M.D., sued Adventist Health System/West and its affiliates for summarily suspending his privileges at Selma Community Hospital for a brief time in 2004 and for failing to process his October 2007 reapplication for privileges at the hospital. Defendants responded to the lawsuit by filing special motions to strike pursuant to California's anti-SLAPP statute.[1] The trial court denied the motions. Defendants appealed.

We conclude (1) Smith has a reasonable probability of succeeding on his claims concerning the 2004 summary suspension and (2) defendants failed to carry their burden of showing that Smith's claim concerning the failure to process his 2007 reapplication arose out of activity protected by the anti-SLAPP statute.

The order denying the anti-SLAPP motions will be affirmed.

## FACTS AND PROCEEDINGS

*Parties*

Plaintiffs in this lawsuit are Smith and two corporations (jointly, Smith) through which he provides medical care to his patients: (1) Valley Family Health Center Medical Group, Inc., and (2) Central Valley Maternal & Child Care Centers, Medical Group, Inc.

Defendants include (1) Adventist Health System/West, (2) Selma Community Hospital (sometimes SCH), (3) Hanford Community Medical Center, (4) Central Valley General Hospital, and (5) Richard Rawson, chief executive officer of Hanford Community Medical Center and the former president of Selma Community Hospital. We refer to the four entities collectively as Adventist Health. The other defendants are (1) the Consolidated Medical Staff of Central Valley General Hospital, Selma Community Hospital and Hanford Community Medical Center (CMStaff) and (2) Nicolas E.

---

[1] Code of Civil Procedure section 425.16. The acronym SLAPP stands for strategic lawsuit against public participation.

All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Reiber, M.D., the chief of the consolidated staff. We refer to the combination of Adventist Health, Rawson, CMStaff and Reiber as defendants.

Adventist Health System/West owns, directly or through its subsidiaries, Selma Community Hospital, Hanford Community Medical Center, and Central Valley General Hospital. In the fall of 2005, Selma Community Hospital, Inc., the corporation that held the license to operate Selma Community Hospital, retired its license and leased the facilities to Hanford Community Medical Center. Since that time, Hanford Community Medical Center has operated the Selma facilities under its license.

Also in the fall of 2005, the medical staffs of the three hospitals were reorganized. Prior to the reorganization, the medical staff of Selma Community Hospital was organized as a separate entity. After the reorganization, the medical staffs of the hospitals were a single entity, CMStaff, which adopted its own bylaws (Bylaws). The proper interpretation of certain provisions of the Bylaws has been an issue between the parties to this appeal. (See *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 750–756 [106 Cal.Rptr.3d 318].)

*Overview of Earlier Litigation*

The disputes between Smith and defendants have generated several lawsuits.[2] The first arose in 2002, when Adventist Health's attempt to purchase Smith's practice and clinics failed. (See *Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501 [75 Cal.Rptr.3d 771] [sale of Smith's clinics was not consummated; buyer sued for return of $250,000 deposit and Smith cross-complained for injunction to protect confidential information].) This court remanded the lawsuit for further proceedings, which resulted in a referee issuing a "Final Statement of Decision Following Appeal and Remand" dated June 24, 2010.[3]

A second lawsuit arose out of disputes concerning Smith's hospital privileges at Hanford Community Medical Center and Central Valley General Hospital (the Hanford hospitals). The latter was the hospital that attempted to purchase Smith's practice and clinics. Smith's privileges were terminated and

---

[2] Those lawsuits reflect the divergent positions taken by the parties regarding Smith's competence, ethics, and behavior. The divergent positions were summarized by this court in *Smith v. Adventist Health System/West, supra,* 182 Cal.App.4th at pages 736–737 to illustrate the polarized nature of the litigation.

[3] Adventist Health requested this court to take judicial notice of the referee's decision, which it characterizes as containing findings of multiple and knowing instances of Smith's double billing the federal and state governments. In an unpublished part of this opinion, the request for judicial notice is denied.

he filed a petition for writ of mandamus to restore those privileges. Smith's writ petition remained pending until Smith requested its dismissal in January 2008. (See *Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1520 [80 Cal.Rptr.3d 745] [Selma Community Hospital requested judicial notice of Smith's dismissal].) No appeals resulted from that lawsuit.

A third lawsuit was filed in April 2004 when Selma Community Hospital summarily suspended Smith's hospital privileges. The 2004 lawsuit is described in part II.A.3.–5., *post.*

In July 2005, Smith filed a mandamus proceeding to challenge the July 7, 2005, decision of the governing board of Selma Community Hospital to terminate his hospital privileges and medical staff membership. (*Smith v. Selma Community Hospital, supra*, 164 Cal.App.4th at pp. 1498–1499.) In June 2006, the trial court issued a writ of mandate directing that Smith's privileges at the hospital be reinstated. This court affirmed. (*Smith v. Selma Community Hospital, supra*, at p. 1521.)

The issuance of the June 2006 writ of mandate directing that Smith's privileges at Selma Community Hospital be reinstated led to further disputes regarding its enforcement. Those disputes were resolved when the Fresno Superior Court filed an order dated December 5, 2006, directing that Smith "shall be permitted to practice on the Consolidated Medical Staff at . . . Selma Community Hospital for a period of one (1) year following the submission of his application, and then must reapply for privileges, as would any other physician practicing there." Adventist Health complied with the December 5, 2006, order and Smith was allowed to practice at Selma Community Hospital.

After prevailing in the appeal of the mandamus proceeding, Smith filed a motion for attorney fees under Business and Professions Code section 809.9. The trial court denied the motion and this court reversed and remanded for further proceedings. (*Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1 [115 Cal.Rptr.3d 416].)

*Smith's Reapplication and Its Rejection*

About two months before the year of court-ordered privileges were scheduled to end, Smith submitted a cover letter and package of documents to CMStaff. The October 12, 2007, cover letter described the enclosures as Smith's medical staff application package. The enclosures were a seven-page preprinted form titled "California Participating Physician Reapplication,"

supplemental answers to attestation questions asked in part XII of the form, and a family practice privilege list.

In response to Smith's reapplication package, Reiber sent Smith a letter dated December 4, 2007, the first paragraph of which stated: "The Medical Executive Committee of the [CMStaff] considered your application for membership on the [CMStaff] at its meeting on Tuesday, December 4, 2007. Your application cannot be accepted since you have not yet satisfied the waiting period which applies in the case of an adverse appointment decision. We informed you last year that you were not eligible to apply for reinstatement because you had failed to satisfy the waiting period. Please see the letter dated February 21, 2007."

The referenced waiting period is established by section 4.5-10 of the Bylaws, which is titled "Reapplication After Adverse Appointment Decision" and provides in full: "An applicant who has received a final adverse decision regarding appointment shall not be eligible to reapply to the medical staff for a period of 36 months. Any such reapplication shall be processed as an initial application, and the applicant shall submit such additional information as may be required to demonstrate that the basis for the earlier adverse action no longer exists."

The December 4, 2007, letter noted that (1) Smith had been denied reappointment at the Hanford hospitals in early 2004, (2) Smith had filed a writ of mandate proceeding to challenge those denials of reappointment, and (3) the writ of mandate proceeding was still pending in court. Because Smith's writ of mandate proceeding was still pending, the letter asserted, "there is no final decision in that matter. Once a final decision has been reached, if it remains adverse, you will be required to wait three years before you may apply for medical staff membership and clinical privileges."

The letter also advised Smith that his court-ordered privileges to practice at Selma Community Hospital would expire on December 19, 2007, and after that date he would no longer have privileges to practice there. The letter did not identify any internal procedure by which Smith could challenge the decision that he was not eligible to apply for hospital privileges. Instead, it advised Smith to have his attorney contact CMStaff's attorney if he had "any questions regarding why your application cannot be accepted."

On December 10, 2007, Smith's attorney sent a letter to the lawyer representing CMStaff. Her letter stated Smith's reasons for disagreeing with the decision to reject his reapplication for privileges, including the following: "The [December 4, 2007,] letter is inherently inconsistent because it states both that the Hanford decision is not final and that it is final for purposes of

applying 4.5-10 of the Bylaws. The hospital's position is absurd for not only this reason, but for others, including the possibility that Dr. Smith may prevail on the writ. If that were to happen, even under your contorted interpretation of the provision, there would not be a 'final adverse decision' at all. 4.5-10 then would never apply."

The attorney representing CMStaff, Suzanne van Hall, responded to Smith's attorney in an e-mail letter sent the same day. The response did not address directly the argument regarding the inconsistency between asserting there was no final decision because the writ was pending and asserting a final adverse decision existed for purposes of section 4.5-10 of the Bylaws. Instead, the response asserted: "So long as the petition for writ of mandate is not pursued, Dr. Smith is ineligible to apply. If he prevails on the writ, he will be reinstated pursuant to the court order; if he does not prevail, the decision will be final and the three year waiting period will commence."

The letter from van Hall offered no explanation for the position that Smith was ineligible *before* the 36-month period of ineligibility commenced.

*Proceedings in the Superior Court*

The exchange of letters did not convince Smith that CMStaff had acted properly when it refused to accept and process his reapplication. Consequently, on December 12, 2007, he sued defendants in Fresno Superior Court, seeking a preliminary and permanent injunction and damages.

Smith also filed an ex parte application for a temporary restraining order and an order to show cause regarding the issuance of a preliminary injunction. On December 20, 2007, the Fresno Superior Court denied the application for a temporary restraining order on three grounds, including improper venue. (*Smith v. Adventist Health System/West, supra*, 182 Cal.App.4th at p. 733.) Near the end of March 2008, the case was transferred to Kings Superior Court as a result of Adventist Health's successful motion for a change in venue. (*Ibid.*)

In June 2008, the Kings Superior Court granted Smith a preliminary injunction that restored Smith's hospital privileges during the pendency of the lawsuit. Adventist Health appealed that order. This court affirmed the preliminary injunction order in March 2010. (*Smith v. Adventist Health System/West, supra*, 182 Cal.App.4th at p. 757.) We concluded, among other things, that the trial court did not err when it "expressly found that Smith was likely to prevail on the merits . . . ." (*Id.* at p. 731.)

While the appeal concerning the preliminary injunction was pending, the litigation continued in the superior court. In October 2008, Smith filed a motion for leave to file a first amended complaint. The superior court granted the motion without prejudice to defendants reasserting arguments in a demurrer or motion to strike. Consequently, Smith's first amended complaint is the pleading relevant to this appeal.[4]

The first amended complaint includes claims for (1) intentional interference with the right to pursue a lawful occupation, (2) interference with prospective business advantage, (3) unfair competition, and (4) violations of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.). Smith alleged, among other things, that defendants' refusal to accept and consider Smith's reapplication for privileges violated California law and the Bylaws, and that the summary suspension of Smith in 2004 was illegal.[5]

On December 4, 2008, Adventist Health filed a special motion to strike under section 425.16. The motion asserted that (1) Smith failed to allege he exhausted his administrative remedies and exhausted his judicial mandamus remedies prior to seeking damages, (2) Smith improperly resurrected allegations regarding the 2004 summary suspension, (3) the alleged wrongs were absolutely privileged, and (4) the alleged coconspirators were legally incapable of conspiring because they were pursuing a single economic interest.

The same day, Rawson filed a separate special motion to strike under section 425.16. Rawson's motion asserted that the alleged wrongful peer review actions (1) were not committed by him and (2) were privileged pursuant to Civil Code sections 43.8 and 47, subdivision (c).

On December 10, 2008, CMStaff and Reiber each filed a special motion to strike under section 425.16 and set the time of the hearing to coincide with the hearing on the motions by Adventist Health and Rawson. CMStaff asserted that Smith failed to exhaust his administrative and judicial remedies and could not establish an entitlement to reinstatement. Reiber's motion stated that he joined in the arguments of CMStaff, Adventist Health, and Rawson and also asserted that the claims against him were barred by the immunity provided by Civil Code sections 43.7, subdivision (b), and 47.

---

[4] To place this pleading in the context of the broader litigation between the parties, we note it was prepared after this court's July 2008 decision in *Smith v. Selma Community Hospital, supra,* 164 Cal.App.4th 1478, but before the California Supreme Court denied the hospital's petition for review.

[5] The claim regarding the 2004 summary suspension was added by the first amended complaint. The facts concerning that suspension are set forth in part II.A., *post.*

Smith filed an opposition to each of the four motions to strike. In support of his oppositions, Smith filed (1) a request for judicial notice of 11 documents, (2) declarations from himself, Linda Smith, and his attorney, Barbara Hensleigh, and (3) 32 exhibits that included declarations, excerpts from discovery responses, minutes from meetings of Selma Community Hospital's medical executive committee, and other documents.

Defendants filed replies to Smith's oppositions. Adventist Health and Rawson opposed Smith's request for judicial notice and filed evidentiary objections to the declarations and exhibits submitted by Smith. CMStaff filed the declaration of Glenda Zeismer, the director for medical staff services for CMStaff, which attached excerpts from a manual of accreditation standards promulgated by an organization identified as the "Joint Commission."

Smith objected to the Zeismer declaration and attachments and filed a response to the evidentiary objections made by Adventist Health and Rawson.

On January 28, 2009, the superior court held a hearing on the motions to strike. In February 2009, the court issued a seven-page written order denying the motions. The court did not reach the objections made by defendants to Smith's evidence.[6]

On March 3, 2009, Adventist Health and Rawson filed a notice of appeal. The appeal became case No. F057211 in this court. Also on March 3, 2009, CMStaff and Reiber filed a notice of appeal, which this court designated as case No. F057212. (*Smith v. Consolidated Medical Staff of Selma Community Hospital* (Nov. 16, 2010, F057212) [nonpub. opn.] (case No. F057212).)

In April 2009, this court denied Smith's motion to consolidate case Nos. F057211 and F057212 with the pending appeal of the preliminary injunction order. (*Smith v. Adventist Health System/West, supra*, 182 Cal.App.4th at p. 735, fn. 3.) We also directed the coordination of case Nos. F057211 and F057212 so they would be considered at the same time by the same panel.

## DISCUSSION

I.  *California's Anti-SLAPP Statute*

A.  *Background*

In 1992, the California Legislature found and declared that "there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise

---

[6] At defendants' request, we will rule on some of their objections in the first instance.

of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).)[7] The Legislature also found and declared that "it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." (§ 425.16, subd. (a).) When the abuse of the judicial process involves a meritless suit brought against someone who has exercised a specified constitutional right, the suit is referred to as a SLAPP. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 [39 Cal.Rptr.3d 516, 128 P.3d 713].)

■ The Legislature addressed the SLAPP problem by enacting section 425.16, which is known as California's anti-SLAPP statute. (*Rusheen v. Cohen, supra*, 37 Cal.4th at pp. 1055–1056.) The statute created a procedural remedy—specifically, a special motion to strike—designed to dispose of some SLAPP's at an early stage in the litigation. (§ 425.16, subd. (b)(1).)

### B.   *Test for Determining Whether to Grant the Motion to Strike*

■ A cause of action is subject to being struck under the anti-SLAPP statute when two conditions are met. Stated in general terms, the cause of action must (1) arise from protected speech or petitioning and (2) lack even minimal merit. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 [124 Cal.Rptr.2d 530, 52 P.3d 703].) Courts determine whether the two conditions have been met by using a two-step inquiry that involves shifting burdens.

#### 1.   *Arising from protected activity*

Initially, the party filing the motion to strike has the burden of showing that the cause of action arises from a protected activity—that is, an act in furtherance of the right of petition or free speech. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [12 Cal.Rptr.3d 54, 87 P.3d 802].)

Disputes over whether the moving party has carried this burden tend to involve one or both of two questions: Did the moving party's act constitute protected activity? Did the cause of action arise from the protected activity?

The analysis of the first of these questions is aided by the definition set forth in subdivision (e) of section 425.16: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United

---

[7] These constitutional rights are set forth in article I of the California Constitution. Section 2, subdivision (a) of article I provides that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Section 3, subdivision (a) of article I states that the people have the right to "petition government for redress of grievances . . . ."

States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Thus, a moving party can meet his or her initial burden by demonstrating that the act underlying the plaintiff's cause of action fits one of the categories included in section 425.16, subdivision (e). (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 88.)

The analysis of the second question, which concerns the strength of the connection between the protected activity and the lawsuit, is aided by the California Supreme Court's decision in *City of Cotati v. Cashman* (2002) 29 Cal.4th 69 [124 Cal.Rptr.2d 519, 52 P.3d 695]. In that case, the owners of mobilehome parks had filed a federal action challenging a rent stabilization ordinance applicable to such parks. (*Id.* at p. 71.) In response, the city filed a state court action seeking declaratory relief that the ordinance was constitutional and valid. (*Ibid.*)

■ The Supreme Court considered whether the city's state court action constituted a SLAPP. (*City of Cotati v. Cashman, supra*, 29 Cal.4th at p. 72.) It addressed the meaning of the statutory phrase "cause of action . . . arising from" (§ 425.16, subd. (b)(1)), and refused to construe "arising from" to mean "in response to." (*City of Cotati v. Cashman, supra*, at p. 77.) Instead, the court determined that the phrase "arising from" means simply that "the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*Id.* at p. 78.)

Accordingly, a court must review the activity or facts that underlie the cause of action challenged by the anti-SLAPP motion. (*City of Cotati v. Cashman, supra*, 29 Cal.4th at p. 79.) Applying its interpretation to the facts presented in *City of Cotati*, the court concluded that the city's cause of action for declaratory relief arose out of the challenged ordinance rather than from

the owners' federal lawsuit. Thus, the city's action was not a SLAPP. (*Id.* at pp. 74, 80.)

## 2. *Probability of prevailing*

■ If the moving party has carried its initial burden, the complaining party then has the burden of demonstrating a probability of prevailing on the claim. (*Zamos v. Stroud, supra,* 32 Cal.4th at p. 965.) To satisfy this burden, the complaining party " ' "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.]' " (*Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1056.) In other words, the complaining party need only show that (1) its pleading stated a legally sufficient claim and (2) it has enough evidence to prove the claim.

## C. *Standard of Review*

"Review of an order granting or denying a motion to strike under section 425.16 is de novo." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30].)

A court that reviews a special motion to strike is required by statute to "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) When considering the declarations and affidavits submitted, the court does not weigh credibility or compare the weight of the evidence. (*Soukup v. Law Offices of Herbert Hafif, supra,* 39 Cal.4th at p. 269, fn. 3.) "Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [12 Cal.Rptr.3d 786].)

## II. *The 2004 Summary Suspension*

### A. *Background*

#### 1. *Events preceding the 2004 summary suspension by SCH*

In mid-2003, the judicial review committee of the Hanford hospitals was reviewing charges against Smith for substandard care, abusive behavior, and falsification of records at those hospitals. During that time, Selma Community Hospital notified Smith that its governing board had ratified the approval of Smith's reappointment to its medical staff for the two-year period ending June 25, 2005.

Later, the judicial review committee of the Hanford hospitals upheld the summary suspension of Smith's privileges at those hospitals and recommended the termination of his membership and privileges. In early 2004, the governing boards of each of the Hanford hospitals sustained the findings and conclusions of the judicial review committee, and the governing boards' decisions became the final administrative decisions in the peer review proceedings of those hospitals.

In March 2004, Smith provided Selma Community Hospital with a copy of the final administrative decisions.

On March 15, 2004, Smith met with Darrick Wells, M.D., who was the chief of staff at Selma Community Hospital. Dr. Wells told Smith that his privileges would be summarily suspended if he did not resign his membership or request a leave of absence. Smith did neither.

2. *The summary suspension*

On March 23, 2004, Dr. Wells sent Smith a letter advising him that the medical executive committee of Selma Community Hospital had summarily suspended his staff membership and clinic privileges at the hospital, effective at 12:01 a.m. on March 27, 2004.[8] The letter stated the bases for the summary suspension were the findings and conclusions from the peer review proceedings at the Hanford hospitals. The letter also stated that the medical executive committee would review and consider the suspension at its next meeting and Smith could attend that meeting.

At the April 8, 2004, meeting of the medical executive committee of Selma Community Hospital, Smith was given an opportunity to address the committee regarding the summary suspension. After Smith left, the committee considered a motion to continue Smith's summary suspension and to recommend the termination of his membership and clinical privileges at Selma Community Hospital. The minutes indicate that the motion passed unanimously, with Dr. Bruno Garcia abstaining due to a conflict of interest.

3. *Smith's lawsuit and the temporary restraining order*

Smith responded to the summary suspension by filing a lawsuit against Selma Community Hospital and Adventist Health System/West in Fresno Superior Court (*Smith v. Selma Community Hospital* (2005, No. 04CECG01188)) (case

---

[8] The meeting of the medical executive committee referenced in the letter was held on March 18, 2004. The minutes of that meeting are among the exhibits Smith presented to support his opposition to the motions to strike. Smith attended that meeting, stated his position, and left before the committee voted to summarily suspend.

No. 04CECG01188) and requesting a temporary restraining order. On April 29, 2004, Smith obtained a temporary restraining order enjoining Selma Community Hospital from taking any action to suspend, restrict or otherwise impede Smith's staff membership or privileges.

On May 5, 2004, the medical executive committee of Selma Community Hospital held a meeting that was attended by Rawson (the hospital's president, who also was the president of the Hanford hospitals), a representative of Selma Community Hospital's governing board, and Zeismer, the hospital's director of administration. SCH's medical executive committee approved making an offer, contingent upon Smith dismissing his lawsuit against SCH in its entirety, to (1) rescind Smith's summary suspension; (2) rescind the recommendation to terminate his medical staff membership and clinical privileges; (3) not use the findings of the judicial review committee in the Hanford proceedings as the basis for (a) future corrective action or (b) denial of reappointment to SCH; (4) base future corrective action against Smith on events occurring after May 5, 2004; and (5) submit corrected reports to the Medical Board of California and the National Practitioner Data Bank. Smith did not accept the offer.

### 4.  *SCH rescinds the summary suspension*

At the June 4, 2004, meeting of Selma Community Hospital's medical executive committee, Dr. Wells informed the committee that Smith had rejected the settlement offer. The medical executive committee discussed the situation, voted unanimously to rescind the summary suspension (which was no longer actually operating because of the temporary restraining order), and voted to continue with the recommendation to terminate Smith's medical staff membership and clinical privileges.[9]

### 5.  *Smith's lawsuit is dismissed*

In addition to rescinding the summary suspension, Selma Community Hospital and Adventist Health System/West responded to Fresno Superior

---

[9] The following summarizes the history of this recommendation as it worked its way through the hospital's administrative process and the court system: First, the recommendation was rejected by the judicial review committee, which was not persuaded it was reasonable and warranted. Second, the recommendation was adopted by the governing board of Selma Community Hospital when it reversed the judicial review committee. Third, the recommendation was addressed in a mandamus proceeding, Fresno Superior Court case No. 05CECG02293 (*Smith v. Selma Community Hospital* (2006, No. 05CECG02293)). The trial court overruled the governing board's decision to adopt the recommendation. Fourth, this court affirmed the trial court's decision in *Smith v. Selma Community Hospital, supra*, 164 Cal.App.4th 1478. Consequently, the final result of the internal administrative proceeding and the judicial mandamus proceeding was that Smith prevailed and the decision of the judicial review committee to reject the recommendation was upheld.

Court case No. 04CECG01188 by filing a demurrer and motion to strike. They argued that Smith's claims for injunctive relief and tort damages arising from the allegedly improper summary suspension were barred by his failure to exhaust administrative remedies.

The superior court took the matter under submission on June 30, 2004, and, the next day, issued a written order sustaining the demurrer. The court rejected the argument that the temporary restraining order should be interpreted to mean that it was proper for Smith to resort to the court because there were no internal remedies to exhaust. The court stated that the ruling on the temporary restraining order contemplated that administrative proceedings would proceed. The court also rejected the argument that there was no need to exhaust administrative remedies because the summary suspension had been rescinded. The court stated: "But that argument ignores the fact that [Smith's] causes of action are premised (in part) upon the theory that the prior administrative actions were taken without sufficient justification or grounds, but were instead based on improper motives. Accordingly, [Smith's] hearing regarding his staff privileges and the merits of whether there is cause for termination thereof should proceed through the administrative process to completion before [Smith] may pursue tort damages. [¶] It seems plain that [Smith] should be required to exhaust the internal remedies in the present case prior to filing suit for damages in court. As Defendants correctly note, 'all of [Smith's] causes of action are premised on the theory that the administrative actions taken thus far are based on improper motives and were unjustified. As such, Smith is required by the doctrine of exhaustion to first adjudicate his claims using available administrative remedies.' "

Based on this rationale, the court concluded: "The demurrer on the ground of failure to exhaust internal remedies should be sustained as to the entire Complaint, without leave to amend." The resulting judgment of dismissal effectively ended case No. 04CECG01188 because Smith dismissed his appeal shortly after filing it.

6. *Subsequent lawsuits involving the 2004 summary suspension*

In February 2006, Smith filed a second lawsuit (*Smith v. Selma Community Hospital* (Super. Ct. Fresno County, 2006, No. 06CECG00620)) seeking damages for the 2004 summary suspension. This complaint was dismissed by Smith without prejudice when the parties entered a tolling agreement. The tolling agreement, which operated until December 6, 2008, stated it was the intention of the parties that at the end of the agreement their respective positions would be as they were on May 26, 2005.

Smith's third lawsuit claiming damages caused by the 2004 summary suspension is the present lawsuit. Smith included the claim in the first

amended complaint he filed in October 2008. The claim is among those targeted by defendants' special motions to strike.

### B. *Defendants' Showing Regarding Protected Activity*

Defendants have the burden of showing that Smith's claim concerning the 2004 summary suspension arose from a protected activity. (*Zamos v. Stroud, supra*, 32 Cal.4th at p. 965.)

In *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192 [46 Cal.Rptr.3d 41, 138 P.3d 193] (*Kibler*), a hospital had summarily suspended the physician's staff privileges for about two weeks and reinstated them after a written agreement was signed in which the physician agreed to refrain from hostile or violent conduct towards other hospital personnel and not keep or carry a firearm on hospital premises. (*Id.* at p. 196.) The physician subsequently sued the hospital and certain physicians and nurses for damages under theories that included defamation, abuse of process, and interference with his practice of medicine. (*Ibid.*) The defendants filed an anti-SLAPP motion. The trial court granted the motion, agreeing with the defendant hospital "that [the physician's] lawsuit arose out of the hospital's peer review proceeding against [the physician] and that hospital peer review was an 'official proceeding' qualifying for the anti-SLAPP statute's motion to strike." (*Kibler*, at p. 197.) The California Supreme Court affirmed, concluding that a hospital peer review proceeding qualified as an " 'official proceeding authorized by law' " within the meaning of section 425.16, subdivision (e)(2). (*Kibler*, at p. 199.)

Because *Kibler* involved a summary suspension and Smith's claim concerns his 2004 summary suspension, we will assume for purposes of this appeal that (1) defendants' acts relating to that suspension of Smith were protected activity for purposes of the anti-SLAPP statute and (2) Smith's claim arose from that protected activity. Because of this assumption, we need not address Smith's contention that the acts upon which his claims are based are not constitutionally protected acts because, unlike *Kibler*, which involved a defamation claim, the basis of his claim is not "any written or oral statement or writing made in connection with an issue under consideration" by the peer review proceeding. (§ 425.16, subd. (e)(2).)

### C. *Smith's Probability of Prevailing*

The next step in our inquiry is to consider whether Smith, the complaining party, has carried his burden of demonstrating a probability of prevailing on the claim based on the 2004 summary suspension. (*Zamos v. Stroud, supra*, 32 Cal.4th at p. 965.)

Defendants contend that Smith cannot establish the requisite level of merit because (1) he cannot show that he exhausted his internal and judicial remedies relating to the claim, (2) the claim is barred by res judicata or collateral estoppel, and (3) the claim is barred by statutory privileges set forth in the Civil Code.

1.–4.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 5. *The absolute privilege under Civil Code section 47*

Civil Code section 47 states: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) . . . (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to [statutory mandamus] . . . ."

In *Kibler*, the California Supreme Court discussed the legislation that amended subdivision (b) of Civil Code section 47 and how that provision compared to section 425.16, subdivision (e)(2), which references an "official proceeding authorized by law." The court stated that subdivision (b) of Civil Code section 47 was amended "to clarify that Civil Code section 47's official-proceedings privilege applied to those proceedings authorized by law that are reviewable by administrative mandate, such as hospital peer review." (*Kibler, supra*, 39 Cal.4th at p. 202.) The court also stated that the legislative history reflected the Legislature's view that the Civil Code section 47 privilege applied to quasi-judicial proceedings conducted by a medical peer review authority. (*Kibler*, at p. 202.) Based on the *Kibler* court's discussion of Civil Code section 47, subdivision (b), we conclude that the statutory phrase "any other proceeding authorized by law and reviewable pursuant to [statutory mandamus]" includes the 2004 peer review proceeding at Selma Community Hospital that resulted in the summary suspension of Smith's privileges.

Accordingly, whether the absolute privilege bars Smith's claims concerning the 2004 summary suspension depends on the meaning and application of the term "publication or broadcast." We note that the term "publication or broadcast" is used in all four of the privileges listed in subdivision (b) of Civil Code section 47.

In *Rusheen v. Cohen, supra*, 37 Cal.4th 1048, the California Supreme Court considered the litigation privilege established by the statutory language

---

[*]See footnote, *ante*, page 40.

concerning a publication or broadcast made in "any . . . judicial proceeding." (Civ. Code, § 47, subd. (b).) Because the privilege protected only publications and broadcasts, the court stated that the threshold issue was whether the defendant's conduct was communicative or noncommunicative. (*Rusheen v. Cohen, supra,* at p. 1058.) "The distinction between communicative and noncommunicative conduct hinges on the gravamen of the action. [Citations.] That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." (*Ibid.*)

In *Rusheen v. Cohen,* Rusheen sued Cohen for abuse of process, alleging that Cohen filed a false declaration regarding personal service of a summons, complaint and order declaring Rusheen a vexatious litigant. (*Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1054.) Relying on the declaration of service, Cohen obtained a default judgment and began to execute on Rusheen's property. (*Id.* at pp. 1053–1054.) The court evaluated the question whether the gravamen of the action was communicative or not by examining Cohen's conduct (1) in filing the allegedly false proof of service and (2) executing on the judgment. First, the court concluded that filing an allegedly false declaration of service of process was a communicative act that fell within the litigation privilege. (*Id.* at p. 1058.) Second, the court indicated that the only theory for why the conduct of executing on the judgment was wrong was based on the allegation that Cohen and his alleged coconspirators filed a perjured declaration of service. As a result, the court concluded "the gravamen of the action was not the levying act, but the procurement of the judgment based on the use of allegedly perjured declarations of service." (*Id.* at p. 1062.) Thus, the court concluded, the litigation privilege covered the communicative act (filing the allegedly false declaration) and extended to necessarily related noncommunicative acts (levying on property). (*Ibid.*)

Here, defendants argue that (1) the "proceeding reviewable by mandate" privilege should be applied broadly, (2) the peer review process is fundamentally a communicative process, and (3) in the context of peer review, it makes little or no sense to separate action from the larger communicative process that produces such action. Defendants acknowledge that, if adopted, their position would effectively eliminate the actions for damages discussed in *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410]. In that case, the California Supreme Court reached two conclusions: "First, we have determined that although a doctor who has been denied hospital staff privileges must exhaust all available internal remedies before instituting any judicial action, including an action seeking only damages, the affidavits in the instant case do not establish that Los Robles [Hospital] provided an available remedy which plaintiff failed to

exhaust. Second, we have concluded that because Los Robles [Hospital] undertook the exclusion without notice or hearing, plaintiff is not precluded from immediately instituting a tort action for damages sustained as a result of such exclusion." (*Id.* at p. 485.)

■ The first of these conclusions indicates that a doctor may sue for damages resulting from the wrongful denial of hospital privileges after the doctor has exhausted available internal remedies.

We conclude that the privilege contained in subdivision (b) of Civil Code section 47 should not be interpreted so broadly that it eliminates these actions for damages.

First, defendants have provided no legislative history or any other material indicating that the Legislature intended the "proceeding reviewable by mandate" privilege to wipe out the actions for damages described in *Westlake Community Hosp. v. Superior Court.*

Second, as a matter of statutory construction, applying the privilege to all acts related to peer review proceedings would read the term "publication or broadcast" out of the privilege set forth in subdivision (b)(4) of Civil Code section 47.

Third, because of the similarities between litigation and a peer review proceeding, it would be difficult to reconcile (1) the conclusion that all acts related to a peer review proceeding are communicative in nature with (2) the determination in *Rusheen v. Cohen, supra,* 37 Cal.4th 1048 that the act of executing on a judgment by levying on property was noncommunicative. (*Id.* at p. 1062.)

Fourth, the broad application of the privilege also would do away with the inquiry that looks at the gravamen of the action test to determine whether the injury resulted from an act that was communicative. (*Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1055.)

Fifth, such a broad application of the privilege would render the qualified privileges relating to peer review proceedings superfluous. (See Civ. Code, §§ 43.7, 43.8.)

■ Rather than broadly applying the "proceeding reviewable by mandate" privilege to all claims alleging a wrongful suspension of privileges after a peer review proceeding, we conclude that such claims should be reviewed on

a case-by-case basis under the test that determines whether the gravamen of the action was communicative. (*Rusheen v. Cohen, supra*, 37 Cal.4th at p. 1058.) Under this test, the key inquiry is "whether the injury allegedly resulted from an act that was communicative in its essential nature." (*Ibid.*)

In conducting this inquiry, we first look at the injury alleged by Smith. That injury was the loss of revenue while he did not have hospital privileges. Smith's declaration states that while the summary suspension was in effect during March and April of 2004, he "lost around $30,000 in reimbursement for the deliveries, post natal care and well born baby care, with a combined net revenue loss for [him and his companies] of around $27,000."[12] Second, we identify the act or conduct that caused this injury. Here, the act that caused Smith's loss of revenue was the summary suspension. Third, we examine Smith's theories as to why the act of suspending him was wrongful. Smith's first legal theory or cause of action alleges that the suspension was "done with the sole purpose and intention of causing SMITH damage and depriving SMITH of his lawful right to practice his occupation." Similarly, Smith's theory of unfair competition alleges that defendants misused the peer review process to gain an advantage over competitors. Thus, the act of suspending Smith's privileges is alleged to be wrong because of defendants' underlying purpose.

Next, we compare the allegedly wrongful suspension of Smith's privileges with the illustrations of communicative and noncommunicative conduct provided in *Rusheen v. Cohen, supra*, 37 Cal.4th 1048. The examples of communicative acts provided in that case included (1) attorney prelitigation solicitations of potential clients, (2) filing pleadings in litigation, (3) testimonial use of illegally overheard conversations, and (4) filing allegedly false declarations. (*Id.* at p. 1058.) Examples of noncommunicative acts included (1) prelitigation illegal recording of confidential telephone conversations, (2) eavesdropping on telephone conversations, and (3) a physician's negligent examination of a patient that caused a back injury. (*Ibid.*)

We conclude that the summary suspension of Smith for allegedly wrongful purposes was a noncommunicative act. The suspension itself is more like the act of levying on property (a noncommunicative act) than the filing of a false declaration (a communicative act). We recognize that communicative acts necessarily were related to the act of suspending Smith's privileges. For example, sending Smith the March 23, 2004, letter informing him of the suspension was a communicative act. Sending the letter, however, was not

---

[12] Defendants' evidentiary objection to this portion of the declaration on the grounds of lack of foundation is overruled.

the wrongful act or the gravamen of the action, and it does not convert the wrongful act (suspension) into a communication.

### 6. *Summary regarding the merits of Smith's claims*

Based on the foregoing discussion of exhaustion of remedies, res judicata, collateral estoppel, and qualified and absolute privileges, we conclude that Smith has demonstrated that his claim concerning the 2004 summary suspension has sufficient merit to withstand the anti-SLAPP motions filed by defendants.

### III. *The 2007 "Screen Out" of Smith's Reapplication*

#### A. *Summary of Claim*

In October 2007, Smith submitted a reapplication for privileges to CMStaff. In December 2007, Smith was informed that the reapplication could not be accepted or considered because he had not satisfied the 36-month waiting period set forth in section 4.5-10 of the Bylaws. That section provides: "An applicant who has received a *final adverse decision* regarding appointment shall not be eligible to reapply to the medical staff for a period of 36 months." (Italics added.) Defendants took the position that the term "final adverse decision" referred to the final decision of a *judicial* proceeding and the 2004 decisions of the governing boards of the Hanford hospitals were not "final" because a writ proceeding was pending in court. In contrast, Smith argued the term referred to the final administrative decision of the hospital governing boards.

Smith's first amended complaint alleged that defendants misinterpreted section 4.5-10 of the Bylaws to deprive him of privileges and cause damage to him and his companies. In addition to the misinterpretation, the first amended complaint also alleged that defendants misapplied their interpretation to him by taking inconsistent positions. On the one hand, they claimed the 2004 decisions of the governing boards of the Hanford hospitals were not "final" because of the pending lawsuit. On the other hand, they claimed Smith was ineligible pursuant to section 4.5-10 of the Bylaws—a provision that bases ineligibility upon the receipt of a final adverse decision.

#### B. *Trial Court's Order on the Anti-SLAPP Motions*

The trial court's order denying the special motions to strike set forth its determinations that (1) Smith's original complaint sought to enforce the Bylaws and the review of his reapplication, (2) there was no available administrative review of the decision to screen out Smith's reapplication,

(3) Smith's claim that the "screen out" resulted from a misinterpretation of section 4.5-10 of the Bylaws was not based on an act in furtherance of protected peer review activity, and (4) the allegations regarding Smith's exclusion from routine peer review activities and the meetings of the CMStaff were merely collateral to the main focus of his complaint.

Based on these determinations, the trial court found that the first amended complaint was not based on communications or conduct subject to a special motion to strike and, as a result, the burden did not shift to Smith to prove his lawsuit had a probability of success.[13]

### C. Defendants' Showing Regarding Protected Activity

#### 1. Involvement of a peer review committee

Defendants challenge the trial court's determination that they did not meet their burden of showing that Smith's claim concerning the 2007 screenout of his reapplication arose from protected activity. Defendants contend peer review activity is protected by the anti-SLAPP statute and the causes of action addressing Smith's 2007 reapplication arose from peer review activity. Specifically, defendants assert that Smith's "claim as to the 36-month rule alleges that a peer review committee (the Consolidated Staff MEC) misinterpreted, misapplied and denied Smith a hearing regarding a medical staff bylaw [citation] that [set forth the waiting period.]" Based on their view of Smith's allegations, defendants contend that the "entirety of the claims alleged in the [first amended complaint] fall squarely within the scope of *Kibler* and involve the public interest."

Defendants' contentions directly contradict the trial court's explicit finding that Smith's reapplication was screened out due to the 36-month waiting period and "never was sent to the department, credentialing committee or the Medical Executive Committee." To resolve this disagreement, we will consider whether defendants established their assertion of fact that it was CMStaff's medical executive committee that interpreted the Bylaws and determined that Smith was not eligible.

First, the December 4, 2007, letter from Reiber to Smith notifying Smith of his ineligibility does not identify who interpreted the Bylaws and determined the meaning of the term "final adverse decision" or who decided that

---

[13] The trial court's order also noted that when it issued a preliminary injunction to Smith it "found that Smith had a probability of success on the merits of the 36 month dispute . . . ." The preliminary injunction and the determination regarding Smith's probability of success on the interpretation of the Bylaws was upheld on appeal. (*Smith v. Adventist Health System/West, supra*, 182 Cal.App.4th at pp. 750–756.)

interpretation applied to Smith's situation. (*Smith v. Adventist Health System/West, supra*, 182 Cal.App.4th at p. 750, fn. 14.)

Second, the record contains no documents that show what occurred at the December 4, 2007, meeting of the medical executive committee of the CMStaff referenced in the letter. For example, the record includes no minutes that reflect the committee considered and voted on how to interpret the Bylaws.

Third, the declaration of Zeismer does not identify who interpreted section 4.5-10 of the Bylaws. Paragraph 19 of her declaration states: "[Smith's October 2007] application was not accepted, and the Medical Executive Committee sent Dr. Smith a letter dated December 4, 2007, informing him that his application had not been accepted . . . ." As with the letter itself, Zeismer's declaration does not identify who interpreted the Bylaws or the procedures used to obtain that interpretation.

Fourth, the declaration of Reiber states that some applications for reappointment do not get beyond an initial screening of the information provided. The declaration also states: "Some applications are deemed incomplete and never reach any Medical Staff department or committee, much less the [medical executive committee] or the Governing Boards. *See* Bylaws section 4.5-3 . . . . Failure to meet threshold criteria for consideration, such as current licensure, adequate professional liability insurance, or <u>as here</u>, sufficient time following an adverse appointment decision, also may prevent an application from being processed further." (Underscoring added.)

The declaration of Reiber, as well as the absence of evidence to the contrary, provides adequate support for the trial court's explicit finding that Smith's reapplication was screened out due to the 36-month waiting period and "never was sent to the department, credentialing committee or the Medical Executive Committee." Therefore, we conclude that defendants have failed to establish the factual premise for their argument that a peer review committee interpreted the Bylaws and determined Smith was not eligible.

### 2. *Any other official proceeding authorized by law*

Despite defendants' failure to establish that a peer review committee interpreted the Bylaws and decided Smith was ineligible, we will consider whether defendants have demonstrated that the procedure resulting in the interpretation and screening out of Smith's reapplication qualified as "any other official proceeding authorized by law" under paragraph (1) or (2) of subdivision (e) of section 425.16. In other words, does the consideration of the Bylaws' threshold criterion regarding the passage of time since an adverse appointment decision constitute an official proceeding authorized by law?

In *Kibler*, the court concluded that the peer review proceeding that resulted in the summary suspension of a physician constituted an "official proceeding" under the anti-SLAPP statute. (*Kibler, supra*, 39 Cal.4th at p. 200.) The court reached this conclusion because the procedures followed were required by Business and Professions Code section 805 et seq., a comprehensive statutory scheme that governs hospital peer review proceedings. (*Kibler*, at p. 199.) In addition, the court determined there were other attributes of the proceeding in question that supported its conclusion—specifically, (1) the hospital was required to report decisions that revoked or restricted a physician's staff privileges to the Medical Board of California (the licensing body) and (2) the decision was subject to judicial review by administrative mandate. (*Id.* at p. 200.)

In contrast to a summary suspension, the screening out of Smith's reappli-cation (1) was not shown by defendants to have been done pursuant to procedures governed by the Business and Professions Code, (2) did not require a report be made to the Medical Board of California, and (3) was not accompanied by the right to an administrative hearing and the further right to have the results of the administrative hearing judicially reviewed by adminis-trative mandate.[14] Consequently, we conclude that defendants failed to establish that the screening out of Smith's reapplication constituted an "official proceeding" for purposes of the anti-SLAPP statute.

### 3.   *Summary*

The trial court correctly concluded that the sequence of actions that resulted in defendants' screening out Smith's reapplication was not taken in the context of an "official proceeding authorized by law" and, therefore, those actions were not protected activity for purposes of the anti-SLAPP statute. Based on this determination, we conclude the burden did not shift to Smith to show his claims concerning the screenout had a probability of succeeding and we need not address whether he satisfied that burden. Furthermore, we need not address the evidentiary objections that related to evidence submitted by Smith to carry that burden.

### IV.   *Other Matters**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[14] Defendants' reliance on Business and Professions Code section 2282.5 is not persuasive because, among other things, neither the second nor third criterion was met.

*See footnote, *ante*, page 40.

## DISPOSITION

The trial court's February 19, 2009, order denying defendants' special motions to strike is affirmed. Plaintiffs shall recover their costs on appeal.

Levy, Acting P. J., and Hill, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 2, 2011, S189295. Werdegar, J., did not participate therein.