Filed 4/2/15 (unmodified opn. attached)
CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MARVALYN DECAMBRE, | D063462 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00097681-CU-WT-CTL) |
| RADY CHILDREN'S HOSPITAL-SAN DIEGO et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is so ordered that the opinion filed herein on March 11, 2015, be modified as follows:

1. On page 24, footnote 11, the third sentence is removed and replaced with the following sentence:

"However, we do not agree with defendants that DeCambre's claims of harassment, IIED and defamation are based on defendants' efforts to address DeCambre's allegedly improper behavior."

**There is no change in the judgment.**

The petition for rehearing is denied.

O'ROURKE, Acting P. J.

Copies to: All parties

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MARVALYN DECAMBRE, | D063462 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00097681-CU-WT-CTL) |
| RADY CHILDREN'S HOSPITAL-SAN DIEGO et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel Pressman, Judge. Reversed in part and remanded with directions.


Donald Aquinas Lancaster, Jr., for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Marilyn R. Moriarty, Lann G. McIntyre and Jeffry A. Miller for Defendant and Respondent Rady Children's Hospital-San Diego.

Paul, Plevin, Sullivan & Connaughton, E. Joseph Connaughton, Sandra L. McDonough and Corrie J. Klekowski for Defendant and Respondent Children's Specialists of San Diego.

Andrews · Lagasse · Branch & Bell, Margaret C. Bell and Lisa Marie Magorien for Defendant and Respondent the Regents of the University of California.

I

INTRODUCTION

Marvalyn DeCambre, M.D., appeals a judgment entered after the trial court granted special motions to strike pursuant to Code of Civil Procedure section 425.16[1] brought by defendants Rady Children's Hospital-San Diego (RCHSD), Children's Specialist San Diego (CSSD) and the Regents of the University of California (Regents) (collectively, defendants), and also sustained defendants' demurrers to certain causes of action in DeCambre's complaint.  DeCambre, a physician specializing in pediatric urology, filed an action against RCHSD, CSSD and the Regents alleging retaliation, harassment, racial discrimination, failure to prevent discrimination and wrongful termination under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).  DeCambre also brought claims against all defendants for intentional infliction of emotional distress (IIED), defamation, and violations of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.).  The theme of DeCambre's complaint is that

_____

[1]     Further statutory references are to the Code of Civil Procedure unless otherwise indicated.
        Section 425.16 is commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute.  (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

2

throughout her tenure at RCHSD, defendants discriminated against her because of her race and gender.

Each defendant filed a special motion to strike DeCambre's complaint. The trial court granted the motions in full on the ground that all of DeCambre's causes of action arose from RCHSD's decision not to renew its contract for DeCambre's services, which was the culmination of a peer review process that is protected as an official proceeding authorized by law under section 425.16, subdivision (e). The court also sustained defendants' demurrers to DeCambre's claims for IIED, defamation, unfair competition and violation of the Cartwright Act and denied DeCambre's request for leave to amend.

On appeal, DeCambre contends that the trial court erred in granting the special motions to strike because the defendants' peer review process was not entitled to protection under the anti-SLAPP statute and even it was, her claims did not arise from that process. DeCambre also challenges the resulting attorney fee awards and the trial court's order sustaining defendants' demurrers. We conclude that the trial court erred in granting the defendants' anti-SLAPP motions as to DeCambre's claims for harassment and IIED. These claims do not arise from protected activity under section 425.16 and we reject the defendants' attempt to cloak them in the protections afforded to peer review proceedings under the anti-SLAPP statute. Because we reverse this portion of the anti-SLAPP ruling, we also reverse and remand the attorney fee awards. In addition, we remand with directions that the court determine whether DeCambre should be afforded leave to amend her claim for defamation.

3

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*[2]

DeCambre was hired by CSSD in 2006 to provide pediatric urology services to RCHSD.[3]  At the time, George W. Kaplan, M.D., headed the hospital's pediatric urology department.  According to DeCambre, after she was hired, RCHSD's pediatric urology department became the highest ranked in the state.  DeCambre is an African-American woman.  During her tenure at RCHSD, she was the only female minority physician in its department of surgery.

DeCambre alleges that the defendants discriminated against her from the outset of her employment.  DeCambre asserts that she was initially promised a housing allowance of $100,000, but when she arrived in San Diego, she was provided only $75,000 and "*only* after several months of extended negotiation and hardship."  DeCambre also contends that she was promised an office but was not provided one, and instead had to share an office with a physician who was continuing training in a fellowship program.

---

[2]    We take these facts from the allegations of DeCambre's complaint and evidentiary exhibits in the record.

[3]    At the time DeCambre was hired by CSSD, it was a stand-alone pediatric medical group that provided medical services to pediatric patients in San Diego in connection with RCHSD and the Regents.  In September 2009, CSSD, RCHSD and the Regents' department of pediatric surgery formalized a new business structure through the creation of the Medical Practice Foundation, Rady Children's Specialists (RCS).  RCS is a department of RCHSD.  Physicians provide services to RCS through a Professional Services Agreement.  As a result of the restructuring, DeCambre and the other physicians formerly employed by CSSD became employees of the Regents.  The funding for their employment by the Regents is based on services provided to RCS.

She maintains that she was also denied appropriate support staff and was treated as "ancillary" to Kaplan. When DeCambre complained to another physician about the staff's treatment of her, she was advised not to complain. When another male pediatric urologist joined the department in mid-2007, DeCambre claims that he was immediately provided the accommodations that DeCambre had requested, but had been denied.

According to DeCambre, in late 2008 or early 2009, she asked Kaplan, RCHSD Director of Surgical Services Donald Kearns, M.D., and CSSD Executive Director Herbert Kimmons, M.D., to provide her with a mentor. She alleges that they denied her request, but provided mentors to other male, nonminority doctors. DeCambre similarly alleges that in 2010, the support staff responsible for implementing a new electronic medical records system denied her requests for information, while providing the same type of information to Kaplan. DeCambre's complaint also contains allegations of specific statements made by various hospital employees over the course of her tenure that she asserts were racially and/or sexually discriminatory.

According to DeCambre, she complained about the disparate treatment to the hospital's ombudsman in February 2011 and reported one incident of racially discriminatory language to the hospital's Vice Chief of Staff Gail Knight, M.D. In May 2011, DeCambre requested a meeting with Kimmons and Knight because she felt that the then pediatric urology department head, Nicholas Holmes, M.D., was trying to force her out of her position. DeCambre alleges that Kimmons and Knight told her to ignore racial and sexual discrimination. DeCambre claims that she met with personnel from the Regents' Office for the Prevention of Harassment and Discrimination on May 20, 2011,

5

to complain about her circumstances. On that occasion, she was given a letter from the Regents notifying her that she would not be reappointed beyond June 30, 2011, effectively terminating her employment, because CSSD would no longer compensate the Regents for her medical services. DeCambre also alleges that after her termination, defendants made defamatory statements about her to prospective employers.

The defendants tell a vastly different story about DeCambre's employment. They assert that DeCambre's termination was solely a result of her own inappropriate conduct. Defendants allege that throughout her employment at RCHSD, both coworkers and patients complained about DeCambre's disrespectful and insensitive behavior, and that defendants' administrators worked tirelessly to support DeCambre and help her to improve her ability to interact appropriately with staff and patients.

According to CSSD, in 2007, after nurses had complained that DeCambre's behavior was demeaning to them, CSSD hired a consultant to provide support to DeCambre. However, after her first meeting with the consultant, DeCambre refused to meet with him again. After this episode, the defendants continued to receive complaints from both hospital staff and patients about DeCambre's rude behavior. In January 2009, a nurse complained to hospital administrators that DeCambre had retaliated against her after she filed a complaint in November 2008 regarding DeCambre's angry and intimidating behavior. As a result, RCHSD conducted an investigation that concluded with a letter in February 2009 from the hospital chief of staff to DeCambre advising her that the investigation had raised concerns about her behavior. The letter also stated that

6

DeCambre would be required to attend the next meeting of the hospital's well-being committee for assessment.[4]

RCHSD notified CSSD of the retaliation complaint and subsequent investigation. CSSD retained an outside consultant, National Business Investigations (NBI), to conduct its own investigation. That investigation was conducted from March to May 2009 and resulted in an 86-page report that found that the nurse's claims of retaliation by DeCambre were unfounded, but further found that DeCambre had "engaged in behaviors that have negatively interfered with the work environment and the organization's operations." NBI's report also stated that despite having been provided opportunities to improve her interactions with patients and staff, DeCambre had not shown sufficient or sustained improvement. NBI also addressed concerns that DeCambre had raised in her interview with NBI's investigator concerning retaliatory treatment and discrimination based on her race and gender. NBI concluded that DeCambre's allegations could not be substantiated.

As a result of NBI's investigation, on June 1, 2009, CSSD sent DeCambre a "Final Warning" letter informing her that she would be required to complete an off-site intensive behavioral counseling program. The letter also advised DeCambre that her failure to treat all people with whom she interacts on behalf of CSSD with respect and dignity was a violation of the hospital's policies, and that any future failure to comply with the policy would result in her immediate termination. According to RCHSD's Chief Medical

---

4      Only a recitation of these facts by Holmes in his declaration in support of CSSD's special motion to strike is included in the record before this court; the letter itself is not.

Officer Irvin A. Kaufman, M.D., the medical staff's well-being committee required DeCambre to enter into a Behavior Monitoring Agreement, and DeCambre was provided with "informal corrective activities with mentoring and counseling from 2009 through her termination" in 2011.[5]  After the final warning letter was issued, the defendants allege that they continued to receive complaints and grievances from both patients' families and staff about DeCambre.  According to Holmes and Kaufman, in the last two years of her employment, DeCambre received five times as many complaints as the next most complained about physician.

Because of these continuing complaints and DeCambre's apparent inability or unwillingness to change her behavior, on May 12, 2011, RCHSD notified CSSD that it was exercising its contractual right to reject the services of DeCambre.  In his declaration in support of RCHSD's special motion to strike, Kaufman states that "[t]he decision by [RCHSD] to exercise its right to reject Dr. DeCambre as a Medical Group Physician was based upon all of this information that was addressed by the peer review process of [RCHSD's] [m]edical [s]taff."  After DeCambre was notified that the Regents would not renew her appointment, DeCambre complained to the Regents that she felt that she had been subjected to a racially and sexually discriminatory working environment.  This prompted the Regents to conduct their own internal investigation, which found no evidence of harassment or discrimination against DeCambre.

---

[5]     Apart from assertions by Kaufman and Holmes in their declarations in support of CSSD's special motion to strike, the record contains no documentation of these activities.

8

B.    *Procedural background*

DeCambre filed suit against CSSD, RCHSD and the Regents on May 18, 2012. Her complaint alleged nine separate causes of action:  retaliation under Government Code section 12940, subdivision (h); harassment under Government Code section 12940, subdivision (j); discrimination based on race, color, national origin, ancestry, marital status, age and gender under Government Code section 12940, subdivision (a); failure to prevent discrimination under Government Code section 12940, subdivision (k); wrongful termination in violation of public policy; IIED; defamation; unfair competition in violation of the UCL; and violation of the Cartwright Act.  Each defendant filed its own anti-SLAPP motion seeking dismissal of DeCambre's complaint.  Each defendant also filed a separate demurrer:  RCHSD and CSSD sought dismissal of the entire complaint as uncertain and also sought dismissal of DeCambre's causes of action for IIED, defamation, and violations of the UCL and Cartwright Act; the Regents sought dismissal of DeCambre's defamation claim.

After issuing a tentative order denying the special motions to strike, the trial court heard argument on all six motions on December 7, 2012, and took the matter under submission.  On December 13, 2012, the trial court issued its order granting the defendants' anti-SLAPP motions in their entirety and sustaining the demurrers as to DeCambre's claims for IIED, defamation, and violations of the UCL and Cartwright Act. Based on its ruling on the anti-SLAPP motions, the court denied DeCambre's request for leave to amend.  In granting the special motions to strike, the court concluded that all of DeCambre's claims arose from protected activity because in each cause of action,

9

DeCambre requested damages for lost earnings, employment benefits and staff privileges, which were the result of the nonrenewal of her contract with the Regents.

The defendants subsequently sought attorney fees and costs incurred in bringing the anti-SLAPP motions. DeCambre opposed the motions. Following a hearing, the court awarded attorney fees and costs to each defendant on April 4, 2013.

III

DISCUSSION

DeCambre contends that the trial court erred in granting the defendants' anti-SLAPP motions and in awarding attorney fees to the defendants. She argues that the defendants' decision to terminate her was not the result of a properly constituted peer review body. DeCambre further contends that even if her termination was the result of peer review activity, her claims arise not from the termination but, rather, from unprotected, discriminatory conduct that occurred outside the peer review proceeding.[6]

DeCambre also argues that the trial court improperly sustained the demurrers to her claims for IIED, defamation and violations of the UCL and the Cartwright Act. DeCambre further contends that even if the demurrers were properly sustained, the trial court erred in denying her leave to amend.

---

[6]     DeCambre also contends that the trial court should not have considered the defendants' special motions to strike because the hearing took place more than 30 days after the motions were served. We do not find merit in this argument. DeCambre did not raise this objection in the trial court and the statutory provision on which DeCambre relies, section 425.16, subdivision (f), requires the clerk of the court to schedule a "hearing not more than 30 days after the service of the motion *unless the docket conditions of the court require a later hearing*." (§ 425.16, subd. (f), italics added.)

A.    *The anti-SLAPP motions*

1.    *The law governing anti-SLAPP motions*

A SLAPP "is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so. ' "While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right." ' (*Castillo v. Pacheco* (2007) 150 Cal.App.4th 242, 249-250, quoting Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997-1998 Reg. Sess.) as amended May 12, 1997, pp. 1-2.)" (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21.)  To combat " 'a disturbing increase' " in this type of lawsuit, in 1992 the Legislature enacted the anti-SLAPP statute, authorizing a "special motion to strike to expedite the early dismissal of these unmeritorious claims." (*Id*. at p. 21.)

That statute, section 425.16, "provides:  'A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819.)  "The analysis of an anti-SLAPP motion thus involves two steps.  'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action

11

is one "arising from" protected activity.  [Citation.]  If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' "  (*Id*. at pp. 819-820.)  " 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' "  (*Id*. at p. 820.)

As used in section 425.16, subdivision (e), an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

The Supreme Court has explained that "the statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.  [Citation.]  [T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech.

12

[Citations.] 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e) . . . .' " (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*Cashman*).)

In an anti-SLAPP analysis we accept as true the plaintiff's pleaded facts. (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 54 (*Young*).) "The evidence of the moving party . . . is considered for whether it defeats, as a matter of law, the evidence submitted by [plaintiff]." (*Ibid.*) "We do not resolve the merits of the overall dispute, but rather identify whether its pleaded facts fall within the statutory purpose, 'to prevent and deter "lawsuits [referred to as SLAPPs] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." ' " (*Ibid.*)

"When considering the declarations and affidavits submitted, the court does not weigh credibility or compare the weight of the evidence." (*Smith v. Adventist Health System/West* (2010) 190 Cal.App.4th 40, 52.) "Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) "On appeal, we independently determine whether this material demonstrates that the cause of action arises from protected activity." (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 670.)

2.      *Application of the anti-SLAPP statute to medical peer review proceedings*

As discussed, section 425.16, subdivision (e) identifies four categories of activities that are " 'in furtherance of' " a defendant's free speech or petition rights.  The second category of conduct pertains to a defendant's statements or writings "in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."  (*Id*., subd. (e)(2).)  "Peer review is the process by which a committee comprised of licensed medical personnel at a hospital 'evaluate[s] physicians applying for staff privileges, establish[es] standards and procedures for patient care, assess[es] the performance of physicians currently on staff,' and reviews other matters critical to the hospital's functioning."  (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199 (*Kibler*).)  The California Supreme Court has defined the phrase " 'other official proceeding authorized by law' " to include the proceedings of a hospital peer review committee.  (*Id.* at pp. 199, 200-201.)

The *Kibler* court identified several attributes of hospital peer review that support this conclusion:  hospital peer review is legally mandated, and serves the essential role of assisting public agencies to regulate the medical profession and "protect[] the public against incompetent, impaired, or negligent physicians."  (*Kibler, supra,* 39 Cal.4th at pp. 200, 199; see Bus. & Prof. Code, § 809.05.)  Additionally, "the Legislature has accorded a hospital's peer review decisions a status comparable to that of quasi-judicial public agencies" by providing that decisions of both entities are reviewable by administrative mandate after a quasi-judicial hearing.  (*Kibler*, at p. 200.)

14

*Kibler* emphasized the important public policy reasons for extending the anti-SLAPP law to the peer review context:  "[M]embership on a hospital's peer review committee is voluntary and unpaid, and many physicians are reluctant to join peer review committees so as to avoid sitting in judgment of their peers.  To hold . . . that hospital peer review proceedings are *not* 'official proceeding[s] authorized by law' . . . would further discourage participation in peer review by allowing disciplined physicians to file harassing lawsuits against hospitals and their peer review committee members rather than seeking judicial review of the committee's decision by the available means of a petition for administrative mandate."  (*Kibler*, *supra*, 39 Cal.4th at p. 201.)

DeCambre argues that the anti-SLAPP protections afforded to the defendants in *Kibler* are not appropriate in this case because the defendants' conduct did not occur within the context of a medical peer review process.  Specifically, she contends that because the defendants did not file a report concerning her contract nonrenewal with the Medical Board under Business and Professions Code section 805, the process that culminated in her termination cannot properly be deemed peer review activity.

We agree with the defendants that their decision not to renew DeCambre's contract was the result of RCHSD's peer review process.  The declarations of Holmes and Kaufman state that the decision not to renew occurred after consultation with the medical staff, the medical staff executive committee and the hospital's governing board, each of

15

which constitutes a peer review body.[7]  Further, the decision not to renew came after years of intervention by the medical staff's well-being committee.  DeCambre does not dispute that she remained under the supervision of that committee from the time she was referred in 2009 until the end of her employment with the defendants.

DeCambre's assertion that because the defendants did not report their decision not to renew DeCambre's contract to the Medical Board of California, there was no peer review, is incorrect.  The statutory scheme governing physician peer review specifically

---

[7]  DeCambre's additional assertion that defendants did not engage in peer review activity because they did not properly form a "peer review body" is not well taken. RCHSD is required by law to engage in peer review activities through its medical staff. (Bus. & Prof. Code, § 800 et seq.; *Kibler*, *supra*, 39 Cal.4th at p. 199.)  Business and Professions Code section 805, subdivision (a)(1)(B) defines a peer review body to include:  "(i) A medical or professional staff of any health care facility or clinic licensed under Division 2 (commencing with Section 1200) of the Health and Safety Code or of a facility certified to participate in the federal Medicare program as an ambulatory surgical center.  [¶]  (ii) A health care service plan licensed under Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code or a disability insurer that contracts with licentiates to provide services at alternative rates of payment pursuant to Section 10133 of the Insurance Code.  [¶]  (iii) Any medical, psychological, marriage and family therapy, social work, professional clinical counselor, dental, or podiatric professional society having as members at least 25 percent of the eligible licentiates in the area in which it functions (which must include at least one county), which is not organized for profit and which has been determined to be exempt from taxes pursuant to Section 23701 of the Revenue and Taxation Code.  [¶]  (iv) A committee organized by any entity consisting of or employing more than 25 licentiates of the same class that functions for the purpose of reviewing the quality of professional care provided by members or employees of that entity."  (Bus. & Prof. Code, § 805, subd. (a)(1)(B).)

The committees in question fall under Business and Professions Code section 805, subdivision (a)(1)(B)(i) (medical staff of a "health care facility" licensed under Division 2 of the Health and Safety Code) as well as subdivision (a)(1)(B)(iv).  DeCambre's assertion that Business and Professions Code section 805, subdivision (a)(1)(B)(iv) requires that *each committee*, itself, is required to have 25 licentiates is incorrect.  The plain meaning of Business and Professions Code section 805, subdivision (a)(1)(B)(iv) is that the entity that organizes the committee, and not the committee itself, must consist of more than 25 licentiates.  (Bus. & Prof. Code, § 805, subd. (a)(1)(B)(iv).)

sets forth the legislative intent that "peer review of professional health care services be done efficiently, on an ongoing basis, and with an emphasis on early detection of potential quality problems and resolutions through informal educational interventions." (Bus. & Prof. Code, § 809, subd. (a)(7).) The scheme, in turn, requires reporting to the Medical Board only when a " 'licentiate's membership, staff privileges, or employment is terminated or revoked for a medical disciplinary cause or reason.' " (*Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 98.) " 'Medical disciplinary cause or reason' " is defined as the "aspect of a licentiate's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." (Bus. & Prof. Code, § 805, subd. (a)(6).) The defendants maintain that the behavior that led to the decision to terminate DeCambre did not involve a "medical disciplinary cause or reason." The fact that the defendants did not report the action to the Medical Board does not show that there was *no* peer review in DeCambre's case, but only that no report was required under these circumstances.[8]

3. *DeCambre's causes of action for harassment, intentional infliction of emotional distress and defamation do not arise from protected activity*

Although we conclude that the decision not to renew DeCambre's contract resulted from a peer review process and thus falls within the protections of the anti-SLAPP statute, we are not persuaded that every cause of action that DeCambre asserts arises

---

[8] Further, to the extent that DeCambre claims she was not afforded the fair process mandated by the peer review statutory scheme, she was entitled to seek judicial review of the decision not to renew her contract "by the available means of a petition for administrative mandate." (*Kibler*, *supra*, 39 Cal.4th at p. 201; Bus. & Prof. Code, § 809.1.)

17

from that protected activity. The question whether a cause of action arises from protected activity concerns "the strength of the connection between [that] activity and the lawsuit . . . ." (*Smith v. Adventist Health System/West, supra,* 190 Cal.App.4th at p. 51.) To be afforded protection "the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*Ibid*.; see also *Navellier v. Sletten* (2002) 29 Cal.4th 82, 92 ["The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning."].) Further, " '[t]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' " (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477; see also *Cashman*, *supra*, 29 Cal.4th at p. 77 ["California courts rightly have rejected the notion 'that a lawsuit is adequately shown to be one "arising from" an act in furtherance of the rights of petition or free speech as long as suit was brought after the defendant engaged in such an act, whether or not the purported basis for the suit is that act itself.' "].)

When a complaint presents a cause of action that involves both protected and nonprotected activities, it is "[t]he '*principal thrust or gravamen*' of the plaintiff's claim [that] determines whether section 425.16 applies." (*Renewable Resources Coalition, Inc. v. Pebble Mines Corp.* (2013) 218 Cal.App.4th 384, 395.) The court must "look to the

allegedly wrongful and injurious conduct of the defendant, *rather than the damage which flows from said conduct*." (*Id.* at pp. 396-397.) "If the core injury-producing conduct by the defendant that allegedly gave rise to the plaintiff's claim is properly described with only collateral or incidental allusions to protected activity, then the claim does not arise out of protected speech or petitioning activity." (*Young*, *supra*, 210 Cal.App.4th at p. 55.)

The defendants maintain that the trial court correctly concluded that DeCambre's claims all arose from protected conduct because in each cause of action, DeCambre sought damages that resulted from the nonrenewal of her contract. In reaching the conclusion that DeCambre's complaint arose from protected activity, i.e., the peer review process, the trial court's order notes that each of DeCambre's causes of action contains a request for "damages for lost earnings, employment benefits and/or staff privileges *as a result of her* [*nonrenewal*]." The trial court's order proceeds to state that DeCambre had not "cited any evidence of retaliation or discrimination which is not connected with the [nonrenewal]," and concludes that, therefore, all of her "allegations are included within the anti-SLAPP statute."

These findings are not supported by the record before the trial court. First, the trial court erroneously focused on DeCambre's damage allegations in determining that all of her claims arose from protected conduct. However, the proper focus is "the 'allegedly wrongful and injury-producing *conduct*' " that gave rise to DeCambre's claims, not the *damages* that she claims. (*Renewable Resources Coalition, Inc. v. Pebble Mines Corp.*, *supra*, 218 Cal.App.4th at p. 396, italics added.) Second, contrary to the court's

19

statement, DeCambre *did* cite evidence of harassment that was not connected to the nonrenewal.

The gravamen and principal thrust of DeCambre's causes of action for harassment and IIED is conduct that occurred independent of the peer review proceedings. More specifically, these claims are not based on the defendants' investigation of staff complaints, their referral of DeCambre to the well-being committee, or the ultimate decision not to renew her contract. Rather, the claims arise from incidents of allegedly disparate treatment that DeCambre claims occurred throughout her employment by the defendants. Thus, these causes of action do not arise from the nonrenewal of DeCambre's contract and the peer review activity that preceded that decision.

For instance, DeCambre alleges that at the outset of her employment in 2006, long before the peer review process began, she was denied adequate support staff and was also provided a lower housing allowance than what she had originally been promised.[9] She also alleges that male physicians were provided with privileges and assistance that she was denied. For instance, DeCambre claims that "[w]hile the staff would obtain and document the vitals of other physician's patients including Dr. Kaplan's patients, the staff repeatedly failed to take the vitals of [her] patients" and failed to customize the operating

---

[9]     Although the court sustained some of the evidentiary objections to DeCambre's declaration in which she repeated many of the allegations contained in her complaint, at this stage we must accept as true DeCambre's pleaded facts. (*Young*, *supra*, 210 Cal.App.4th at p. 54.) To the extent that DeCambre asserted additional facts in her declaration opposing the special motions to strike, we disagree with DeCambre's claim that the court's evidentiary rulings constituted an abuse of its discretion, and we rely only on those portions to which the court did not sustain defendants' objections.

room to her requirements, instead insisting she use the same setup Kaplan used. DeCambre asserts that throughout her employment, support staff and other physicians made racially discriminatory statements and treated her in a discriminatory manner.

None of this conduct occurred within the context of, or in furtherance of, the peer review proceedings. The evidence submitted by the defendants does not demonstrate otherwise. RCHSD asserts that because DeCambre made allegations of adverse treatment when she was interviewed by NBI's investigator and those allegations were reported to CSSD's board of directors and "relied on by other peer review committees in deciding not to renew her contract," the allegedly discriminatory conduct was an "integral part" of the peer review process. We disagree. The fact that DeCambre's allegations of harassment may have been repeated in the peer review setting does not mean that her claim arose from that process.

DeCambre does not dispute that some of her allegations of harassment occurred during the same period of time that the defendants were investigating staff complaints about her, and that NBI's investigation report, which was provided to the hospital's peer review bodies, addressed DeCambre's claims of harassment. However, the conduct underlying DeCambre's claims for harassment and IIED did not occur as part of the peer review proceeding. Rather, the conduct that is the gravamen of these claims occurred separate from the defendants' peer review activity.[10] The references in these two causes of action to damages resulting from the nonrenewal of DeCambre's contract are properly

_____

[10]    We express no opinion on the substantive merits of DeCambre's harassment claim or the defenses RCHSD, CSSD and the Regents may have to this claim.

21

described as "collateral or incidental allusions" to the defendants' nonprotected conduct on which the claims are based. (*Young*, *supra*, 210 Cal.App.4th at p. 55.)

The defendants rely on *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65 (*Nesson*) to support their contention that the trial court properly dismissed DeCambre's entire complaint. In *Nesson*, the hospital's medical executive committee (MEC) summarily suspended plaintiff physician Nesson's medical staff privileges and then terminated his contract to provide radiology services. (*Id*. at pp. 73-74.) The MEC took these actions after " 'incidents of substandard and dangerous patient care' and 'abrupt change in [Nesson's] behavior characterized by volatile and erratic actions.' " (*Ibid*.) After the termination, Nesson filed a complaint against the hospital for breach of contract, retaliation and discrimination, and the hospital successfully moved to strike the suit under section 425.16. (*Id*. at pp. 75-76.)

On appeal, Nesson argued that because his claims were based on the termination of his contract to provide services, and not the suspension of privileges resulting from the peer review proceedings conducted by the hospital, section 425.16 did not apply. (*Nesson*, *supra*, 204 Cal.App.4th at p. 78.) The court rejected the argument, concluding that the hospital's decision to terminate its contract with Nesson was a direct consequence of the summary suspension of his privileges. (*Id.* at p. 81.) The court stated "[t]he gravamen of each cause of action asserted by Nesson is that the Hospital somehow acted wrongfully when it terminated the Agreement because Nesson's privileges were summarily suspended, as he was deemed by the MEC to be a likely imminent danger to patient safety." (*Id*. at p. 83.) The court also noted that Nesson had failed to "cite any

22

evidence of retaliation or discrimination which is not connected with his summary suspension." (*Id*. at p. 84.)

In contrast, as discussed, DeCambre's claims are premised on allegations of harassing conduct unrelated to the defendants' decision not to renew her contract, and which were not a basis for that decision. The gravamen of DeCambre's claims for harassment and IIED is the harassing conduct that DeCambre alleges she was subjected to over the course of her employment by the defendants and their employees, some of which predated any peer review activity.

CSSD asserts "DeCambre tried . . . to dodge the anti-SLAPP statute by arguing that the 'thrust' or 'gist' of her claims was somehow based on perceived harassment and a 'culture of disrespect' (allegedly non-peer review activities), and not on her contract [nonrenewal]." We agree with DeCambre, however, that the thrust of her claims for harassment and IIED *was* the allegedly harassing conduct that occurred outside of the peer review proceedings. The acts of harassment that DeCambre alleges against defendants are distinct from DeCambre's own conduct, which was the subject of the protected peer review. DeCambre's reporting of this conduct to NBI, and NBI in turn sharing DeCambre's allegations with the peer review entities, did not serve to bring that conduct within the scope of the anti-SLAPP protection that is afforded to medical peer review under *Kibler*. The anti-SLAPP protection afforded to peer review proceedings

23

cannot insulate defendants from liability for harassing conduct that DeCambre alleges occurred over the history her employment.[11]

Finally, DeCambre's seventh cause of action for defamation does not arise from the defendants' peer review proceedings. This claim is based on statements allegedly made by defendants to prospective employers of DeCambre *after* the defendants had decided not to renew her contract. Any defamatory statements made by defendants to employers after the peer review process concluded were not statements in furtherance of defendants' right of petition or free speech and, therefore, are not protected by section 425.16. (See *Cashman, supra,* 29 Cal.4th at p. 78 ["defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech"].)

Because we conclude that the defendants failed to meet their threshold burden to show that DeCambre's claims for harassment, IIED and defamation arose from constitutionally protected activity, it is unnecessary to address whether DeCambre met her burden to establish a reasonable probability that she could prevail on these claims.

---

11      We also reject defendants' contention that DeCambre's claims fall under subdivision (e)(4) of section 425.16, a catch-all that protects "any other conduct in furtherance of the constitutional rights of petition [or free speech] in connection with a public issue or an issue of public interest." We take no issue with defendants' assertion that physician competence and behavior are matters of public interest and may be entitled to anti-SLAPP protection under subdivision (e)(4). However, we do not agree with defendants that DeCambre's claims of harassment and IIED are based on defendants' efforts to address DeCambre's allegedly improper behavior. As discussed, the claims are based on harassing conduct that DeCambre alleges the defendants perpetrated against her, apart from her own conduct. The allegedly harassing statements and actions that DeCambre sets out in her complaint were not matters of public interest in the sense that the defendants assert.

24

4.      *Retaliation, discrimination, failure to prevent discrimination, wrongful termination and violations of the UCL and Cartwright Act*

a.      *These claims arise from protected activity*

In contrast to the causes of action discussed in the preceding section, the defendants' special motions to strike did adequately demonstrate that DeCambre's claims for retaliation, discrimination, failure to prevent discrimination, wrongful termination and violations of the UCL and Cartwright Act are protected by the anti-SLAPP statutes.  As discussed, "[w]hen a [complaint] presents a mixed cause of action that involves protected and nonprotected activities, . . . the question presented is 'whether the gravamen of the cause of action targets protected activity.  [Citation.] . . .  Stated differently, the question is whether the protected activity is merely an incidental part of the cause of action."  (*City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 767.)  Allegations of acts that "could each be the sole and adequate basis for liability under the cause of action" are not properly categorized as incidental to the cause of action.  (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1551.)  In determining whether allegations pertaining to protected activity are incidental, courts often consider whether the allegations constitute a substantial or significant part of the factual allegations underlying the claim.  (See, e.g., *A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc.* (2006) 137 Cal.App.4th 1118, 1125 [a "cause of action is vulnerable to a special motion to strike under the anti-SLAPP statute only if the protected conduct forms a substantial part of the factual basis for the claim"]; *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1288 ["[A]llegations of protected conduct in the original

25

intentional interference claim were not merely incidental to the allegations of unprotected conduct. They represent the bulk of the allegations underlying the cause of action."].)

Unlike DeCambre's claims for harassment and IIED, the defendants' decision not to renew DeCambre's contract is central to her causes of action for retaliation, discrimination, failure to prevent discrimination and wrongful termination. Liability for each of these claims rests on that decision. A wrongful termination claim requires a termination, and an essential element of DeCambre's claims for retaliation, discrimination and failure to prevent discrimination under FEHA is an adverse employment action. (Gov. Code, § 12940, subds. (a), (h), & (k); *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 373.) The only adverse employment action that DeCambre alleges is the nonrenewal of her contract.

DeCambre contends that the motive for her termination was discriminatory and, therefore, the termination is not protected by the anti-SLAPP statute. "But the anti-SLAPP statute applies to claims made in connection with the protected activity, regardless of the defendant's motive, or the motive the plaintiff may be ascribing to the defendant's conduct." (*Nesson*, *supra*, 204 Cal.App.4th at p. 83.) The defendants showed that their decision not to renew DeCambre's contract stemmed from the protected peer review activity that began in 2009. This showing is sufficient to satisfy the first prong of the anti-SLAPP analysis.

The same is true for DeCambre's UCL and Cartwright Act causes of action. Her UCL cause of action asserts that the defendants "deprived Plaintiff of the right to earn a living as a pediatric urologist in San Diego County and have attempted to deprive her of

26

staff privileges to treat patients." Similarly, her Cartwright Act claim alleges that the defendants threatened "to deny and revoke from Plaintiff, a duly licensed and accomplished pediatric urologist, the medical staff privileges to which she was rightfully entitled, and access to the patient population she seeks to serve." Without defendants' decision to terminate DeCambre, these claims would be baseless. The thrust of both claims is that defendants' termination of DeCambre was itself unlawful, and that her termination unlawfully had the effect of restricting competition in the market for pediatric urology services.

B.  *DeCambre failed to show a probability of succeeding on the merits of her claims for retaliation, discrimination, failure to prevent discrimination, wrongful termination and violations of the UCL and Cartwright Act*

Because the defendants made the requisite prima facie showing that these claims are based on protected conduct, DeCambre was required to demonstrate a probability of prevailing on these claims. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) In assessing whether a plaintiff has shown a probability of prevailing, courts consider the pleadings and evidence submitted by both the plaintiff and the defendant. (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 80.)

Although "the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) For this prong of the anti-SLAPP analysis, a plaintiff cannot rely on the allegations of his or her complaint, but must present competent and admissible

27

evidence showing that she has a legally sufficient claim. (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1237.)

We agree with the trial court that DeCambre failed to adequately show a probability of prevailing on the merits of these claims. With respect to DeCambre's claim of wrongful termination under the FEHA, DeCambre provides no argument or discussion of the merits of the claim. We therefore deem it abandoned. (See *Oviedo v. Windsor Twelve Properties, LLC* (2012) 212 Cal.App.4th 97, 108, fn. 9 ["Issues as to which an appellant provides no argument or discussion are deemed waived and are properly disregarded."].) With respect to her claims for retaliation, discrimination and failure to prevent discrimination, dismissal of these claims was appropriate because DeCambre failed to make a sufficient showing that the defendants' asserted rational for the decision not to renew her contract was pretextual.

In order to defeat summary adjudication of retaliation and discrimination claims under the FEHA, a plaintiff must show that she was engaged in a protected activity or was a member of a protected class, that she was subjected to an adverse employment action, and that there was a causal connection between the protected activity or class and the alleged adverse action. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1004.) Once this prima facie case is established, the burden shifts to the defendants to show that they have a "legitimate nonretaliatory explanation" for the adverse employment action. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476.) If defendants make this showing, the plaintiff must then establish that the "defendant's proffered explanation is merely a pretext for the illegal termination." (*Ibid*.)

28

" 'The [employee] cannot simply show that the employer's decision was wrong or mistaken . . . . Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [the asserted] non-discriminatory reasons." ' " (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005.)

The defendants do not dispute that DeCambre is a member of a protected class, that any complaints she made concerning discrimination constituted protected activity, or that the nonrenewal of her employment contract was a material adverse employment action. However, defendants contend that DeCambre failed to show a nexus between her protected status or activity and their decision not to renew her contract. Further, the defendants assert that, even if DeCambre could show a causal connection, they had a legitimate, nonretaliatory explanation for their decision not to renew DeCambre's contract.

Defendants presented evidence of a legitimate, nonretaliatory explanation for their decision not to renew DeCambre's contract. The undisputed evidence showed that defendants received a significant number of complaints from patients' families about DeCambre. In the two years prior to her termination, there were five times as many patient complaints about DeCambre as there were regarding the physician with the next highest number. As the trial court found, "[d]espite feedback, mentoring and coaching, [DeCambre's] behavior did not change. The declarations of Dr[s]. Holmes and Kaufman

29

and the supporting evidence demonstrate specific instances of conduct warranting review . . . and ultimately [nonrenewal]."

In the trial court, DeCambre argued that the defendants' proffered justification of patient complaints was pretextual because, according to her own declaration, she "performed her duties as a surgeon at an exceedingly high level" and she had excellent outcomes for patients. DeCambre further pointed to her cooperation with the well-being committee, which, she asserts, commended her for improving interpersonal relationships with staff and also expressed concerns to DeCambre that the complaints against her were frivolous just a few months before her termination. On appeal, DeCambre does not address the defendants' justification for their decision not to renew her contract. Instead, she asserts that she "could establish sufficient facts" to prove her claims. This assertion is not sufficient to carry DeCambre's burden.[12] (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 108 [Plaintiff must show that "there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment."].)

Even if we look to the evidence that DeCambre relied on in the trial court, it does not establish that the defendants' justification for the nonrenewal of her contract was pretextual. With respect to DeCambre's claim that she was a competent surgeon, this evidence does not refute the defendants' assertion that their contract nonrenewal was the result of patient complaints. Nor does DeCambre's statement show that her contract

---

[12]     DeCambre's "failure to present all relevant evidence on the point 'is fatal.' [Citation.] 'A reviewing court will not independently review the record to make up for appellant's failure to carry his burden.' " (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 113.)

nonrenewal was related to her gender or race, or that it constituted punishment for her complaints about discrimination. (See *Hersant v. Department of Social Services*, *supra*, 57 Cal.App.4th at p. 1005 ["It is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound."].) Similarly, even if the well-being committee commended DeCambre for "improving interpersonal relationships with staff," this fact does not undermine the defendants' assertion that DeCambre's contract was not renewed because of ongoing patient complaints.[13]

DeCambre has also failed to meet her burden as to her claims under the UCL and Cartwright Act. DeCambre alleges that defendants engaged in a pattern and practice of discrimination against her and other African-American and female physicians, and that this constitutes an unlawful business practice in violation of the UCL. Under the UCL, "[a]n 'unlawful' business activity includes ' "*anything* that can properly be called a business practice and . . . at the same time is forbidden by law." ' " (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 717-718.) DeCambre presented no evidence to support this theory of liability in response to the special motions to strike.

In order to state a claim under the Cartwright Act, a plaintiff must allege " ' " '(1) formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) damage resulting from such act or acts.' " ' " (*Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 493 (*Marsh*).) " 'An antitrust

---

[13] Further, other than her own declaration, DeCambre offered no evidence concerning the well-being committee's evaluation of her performance.

31

claim must plead the formation and operation of the conspiracy and the illegal acts done in furtherance of the conspiracy. [Citation.] California requires a "high degree of particularity" in the pleading of a Cartwright Act violation [citation] and therefore generalized allegations of antitrust violations are usually insufficient.' " (*Ibid.*) Further, "[i]t is well accepted that 'the " 'antitrust laws . . . were enacted for "the protection of competition, not competitors." ' " [Citation.] . . . Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws.' " (*Id.* at p. 495.)

"Injury to an individual plaintiff is insufficient to establish standing to assert antitrust violations. [Citation.] In the medical field, sufficient, successful allegations of antitrust injury might include negative impacts upon overall prices, quantity or quality of medical services, resulting from the plaintiff's absence as an available provider at the facility." (*Marsh*, *supra*, 200 Cal.App.4th at p. 495.) Importantly, " '[a] staffing decision does not itself constitute an antitrust injury.' [Citation.] Unless the effect of the conduct of a single health care provider is to deny patients reasonable access to any health care, the marketplace is not significantly affected by such individualized conduct." (*Id.* at pp. 498, 499.)

"Before a court will interfere with how one hospital staffs its physician needs, a strong showing would be required that the purpose and effect of the anticompetitive conduct, within the relevant market defined by the plaintiffs, was outside of reasonable professional standards." (*Marsh*, *supra*, 200 Cal.App.4th at p. 499.) DeCambre alleges that the defendants' actions have prevented her, alone, from working as a pediatric

32

urologist in San Diego. This is insufficient to show antitrust injury. DeCambre has thus failed to show that she is likely to succeed on the merits of her Cartwright Act claim.

C.    *Demurrer to the defamation and intentional infliction of emotional distress claims*

In addition to filing anti-SLAPP motions, each defendant also demurred to DeCambre's complaint. RCHSD and CSSD each demurred to the entire complaint as uncertain[14] and also demurred specifically to DeCambre's causes of action for IIED, defamation and violations of the UCL and Cartwright Act. The Regents demurred to DeCambre's defamation cause of action. The trial court sustained the demurrers as to DeCambre's causes of action for IIED, defamation and violations of the UCL and Cartwright Act, and "[b]ased on the ruling on the [a]nti-SLAPP motions," denied leave to amend.

"In evaluating a trial court's order sustaining a demurrer, we review the complaint de novo to determine whether it contains sufficient facts to state a cause of action." (*Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1589.) When a demurrer "is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment:  if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

---

14    The court overruled the demurrer on this ground and RCHSD and CSSD have not appealed that aspect of the trial court's order.

33

Because we affirm the court's ruling granting the defendants' special motions to strike DeCambre's causes of action for violations of the UCL and Cartwright Act, it is unnecessary to address the demurrers to these claims. As for DeCambre's IIED cause of action, she does not present any argument or discussion of the merits of her claim, nor does she address possible amendment of the claim in her briefing. The cause of action is therefore deemed abandoned. (*Oviedo v. Windsor Twelve Properties, LLC, supra,* 212 Cal.App.4th at p. 108, fn. 9.)

With respect to the demurrer to DeCambre's claim for defamation, we agree with the trial court that DeCambre failed to adequately allege that the defendants' statements were actionably defamatory. DeCambre's claim is based on statements purportedly made to prospective employers that she was " 'not a team player.' " This statement is a nonactionable statement of opinion and is also protected by the common interest privilege that applies to communications concerning job performance. (See *Banks v. Dominican College* (1995) 35 Cal.App.4th 1545, 1554 [statements of opinion regarding teacher's unsuitability were not actionable as slander or libel]; and Civ. Code, § 47, subd. (c).)

In view of its ruling on the special motions to strike, the trial court did not address DeCambre's request for leave to amend. (See *Salma v. Capon, supra,* 161 Cal.App.4th at p. 1293 ["When a cause of action is dismissed pursuant to [§] 425.16, the plaintiff has no right to amend the claim."].) On remand, the trial court is directed to determine whether DeCambre met her burden to show that the defects in her defamation cause of action can reasonably be cured by amendment.

34

D.    *Attorney fees*

A defendant who prevails on an anti-SLAPP motion is entitled to recover his or her attorney fees and costs for the motion.  (§ 425.16, subd. (c)(1).)  "Where the motion is partially successful, the question is whether the results obtained are insignificant and of no practical benefit to the moving party.  [Citation.]  A court awarding fees and costs for a partially successful anti-SLAPP motion must exercise its discretion in determining their amount in light of the moving party's relative success in achieving his or her litigation objectives."  (*Cole v. Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1123.)

Each of the defendants brought a motion for attorney fees and costs under section 425.16, subdivision (c)(1).  The trial court granted the motions in full, awarding RCHSD $37,848, CSSD $53,149.23 and the Regents $24,559.40.  Because we reverse the order granting the defendants' anti-SLAPP motions in part, the award of attorney fees and costs also must be reversed.  On remand, the trial court must exercise its discretion to determine the appropriate amount of fees and costs, if any, to which the defendants are entitled.

IV

DISPOSITION

The December 13, 2012, order granting defendants' special motions to strike is reversed as to DeCambre's causes of action for harassment (Gov. Code, § 12940, subd. (j)), IIED, and defamation.  The order sustaining defendants' demurrers to DeCambre's cause of action for defamation is affirmed, but on remand the trial court is directed to

35

determine whether DeCambre should be afforded leave to amend the claim. In all other respects the December 13, 2012, order is affirmed.

The April 4, 2013, order awarding attorney fees and costs to the defendants is reversed. On remand the trial court is directed to determine whether defendants are entitled to attorney fees and costs for their partially successful special motions to strike and, if so, the reasonable amounts of such awards.

The trial court is to conduct further proceedings consistent with this decision. The parties shall bear their own costs on appeal.

AARON, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.