Filed 9/15/16  In re B.W. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.W., a Person Coming Under the Juvenile Court Law. | B268360 |
| | (Los Angeles County Super. Ct. No. DK12698) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
|     Plaintiff and Respondent, | |
|     v. | |
| B.F., | |
|     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Office of the County Counsel, R. Keith Davis, Acting Assistant County Counsel, William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

Undisputed evidence before the juvenile court established B.F. (Mother) and a man she described as her fiancé engaged in a violent altercation while her daughter B.W. was present in the home. The juvenile court asserted jurisdiction over B.W. pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b).[1] Mother concedes the court's subdivision (b) finding is supported by sufficient evidence, and she does not challenge the juvenile court's dispositional orders. Instead, her sole claim on appeal is that the evidence, while sufficient to establish jurisdiction under section 300, subdivision (b), was insufficient to show B.W. is a child described by subdivision (a)—namely, one at substantial risk of suffering serious physical harm inflicted nonaccidentally by the child's parent or guardian. We hold we need not address Mother's contention in light of the uncontested finding, and we briefly explain why affirmance would be required in any event.

## I. BACKGROUND

Mother and G.W. (Father) are the parents of B.W., who was born in 2007. Mother and Father ended their nine year relationship in January 2014, and Mother later began a relationship with a man named Dejohn, who she referred to as her fiancé (because it sounded better than calling him a "boyfriend"). Dejohn and Mother lived together in a home where several of Mother's extended family members also resided.

### A.     *Domestic Violence between Dejohn and Mother*

Dejohn physically assaulted Mother in June 2015, about a year and a half after Mother and Dejohn started dating and while Mother was thirteen weeks pregnant with Dejohn's child. Specifically, on June 18, 2015, Mother and Dejohn argued because he wanted a key to Mother's residence and Mother refused. As the argument escalated, Mother told Dejohn she was scared and was going to call the police. When she picked up the phone, Dejohn ripped the phone from the wall and told Mother that "if [she] call[ed]

---

[1]     Statutory references that follow are to the Welfare and Institutions Code.

2

the police, everyone here will be dead before they get here." Mother then tried to grab her cell phone, but Dejohn grabbed her by her hair and forcefully threw her to the ground. Dejohn then picked Mother up by her hair and threw her onto the couch, ripping out three of her braids in the process. When B.W., who was upstairs when the altercation began, heard the commotion and walked into the room, Dejohn stopped the assault. Mother at that point began hyperventilating and having trouble breathing, and Dejohn called an ambulance.

Hospital personnel diagnosed Mother as suffering from blunt head trauma and lower abdominal pain as a result of the attack. She also complained of pain in her left ear, decreased hearing on her left side, and nausea. Hospital personnel notified law enforcement of the circumstances under which Mother sustained her injuries. Los Angeles County Sheriff's Department deputies responded to the hospital, took a statement from Mother, and offered to get Mother an emergency protective order. She declined the offer, stating she would get a restraining order on her own. Mother also checked out of the hospital early, against medical advice.

The Los Angeles County Department of Children and Family Services (the Department) learned of the altercation between Mother and Dejohn via a referral the day after it happened. When a Department social worker interviewed Mother about the attack, Mother denied Dejohn had assaulted her. She claimed she had gone to the hospital solely because of an allergic reaction to medication she was taking. Mother did admit Dejohn was present in the home on the afternoon in question, but she claimed he was merely yelling to get help. Mother also denied telling the Sheriff's deputies that she had been dragged by her hair or that Dejohn had torn the phone out of the outlet. B.W. was present in the home in a place where she could overhear Mother tell the social worker (falsely, as she would later admit) Dejohn had not attacked her. Despite her denials, Mother agreed to sign a safety plan indicating she would not allow Dejohn into the home.

During its initial investigation, the Department discovered the June 18, 2015, altercation was not the first time there had been a conflict between Mother and Dejohn.

A social worker reviewed 911 call logs and learned that almost seven months earlier, on November 28, 2014, law enforcement had responded after a caller reported Mother and Dejohn were arguing loudly and had a history of domestic violence.

The Department decided to obtain, and did obtain, a court order removing B.W. from her parents' custody. When a Department social worker went to Mother's home to serve the order, the social worker asked Mother if she had obtained a restraining order against Dejohn. Mother said she had not and would not "because she is not afraid of him."[2] The social worker also served the removal order on Father, and he told the social worker that he recently saw Dejohn with Mother—over a month after the June 18 altercation—at a court appearance on a separate matter.

### B.    *The Dependency Petition and Proceedings in the Juvenile Court*

Shortly after obtaining the removal order for B.W., the Department filed a petition asking the juvenile court to assert jurisdiction over B.W. under section 300, subdivisions (a) and (b). Tracking the statutory language, the subdivision (a) count alleged "the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." The facts stated to support jurisdiction under both counts of the petition were identical and provided, in relevant part: "On 6/18/15, the child, [Mother] and the mother's male companion, [Dejohn], engaged in a violent altercation in the presence of the child. The male companion grabbed the mother by her hair and threw the mother to the ground, causing the mother to fall to the ground, striking the mother's hip, in the presence of the child, requiring emergency hospital services . . . . The mother failed to protect the child in that the mother refused to obtain [a] restraining order against the male companion and continued contact with the male companion."

---

[2]     The social worker told Mother that her reluctance to be forthcoming about the incident appeared to be an attempt to protect Dejohn, and the social worker also tried to explain how domestic violence would affect B.W. Mother, however, "was yelling and unable to have an appropriate dialogue."

4

A Department report prepared for the detention hearing on the petition recommended the court order B.W. detained from Mother's custody. The report noted it was "unclear if [Dejohn] continues to reside in the home with the mother and child and there is no protective means by which the mother can ensure she and the child can reside safely in the home." The juvenile court agreed with the Department's recommendation, detained B.W. from Mother, and released the child to Father pending further proceedings.

The Department prepared another report in connection with the jurisdiction and disposition hearing. It detailed statements made by eight-year-old B.W., Father, and Mother concerning the domestic violence between Mother and Dejohn. B.W. told a Department social worker that Dejohn "puts his hands on" Mother and "hits her." B.W. specifically related one violent incident that occurred prior to the June 18, 2015, altercation referenced in the section 300 petition: a physical fight between Mother and Dejohn at a barbershop in July 2014. B.W. said she witnessed the incident and Mother suffered an injury to her elbow; when the social worker inquired further, B.W. "shut down" and said "'I don't want to get in trouble.'" Father denied witnessing any domestic disputes between Mother and Dejohn himself, but he told the social worker that B.W. told him on various occasions that Dejohn "'beat' on" Mother. In a phone call with the social worker, Mother admitted the allegations in the petition concerning the June 18 altercation with Dejohn were true, but she claimed it was the first time that "something like this happened." Mother also claimed she last had contact with Dejohn in about mid-August 2015, and she said she obtained a restraining order against him later that same month.

The Department's jurisdiction report recommended the juvenile court sustain the section 300 petition and terminate the case with an order giving Father sole physical and legal custody of B.W. In making its recommendation, the Department questioned Mother's ability to ensure the ongoing safety of B.W. in light of her involvement with Dejohn: "Mother does not appear to be forthright and is in denial as to her history of domestic violence with Dejohn[,] and Mother only obtained a restraining order against Dejohn due to [Department]/Court involvement. Mother continues to communicate with

5

Dejohn through his family members. Mother's actions are indicative that she may reconcile and resume her relationship with Dejohn."

Shortly before the jurisdiction hearing, the Department filed a Last Minute Information report. According to the report, Mother said there was no longer an existing restraining order against Dejohn because the order expired.[3] The parties appeared for the jurisdiction hearing as scheduled, and the court continued the matter to permit the Department to complete required investigation under the Indian Child Welfare Act. At the request of counsel for B.W., the court also ordered the Department to submit a report on "whatever transpired today and any type of law enforcement involvement before today's hearing here in the courthouse."

The Department submitted just such a report prior to the continued jurisdiction hearing, and it revealed there had been an incident involving Dejohn, Father, and Father's mother before the initial hearing on jurisdiction. Father and his mother reported Dejohn had been harassing them in the courthouse and at one point attempted to pull B.W. away from Father's mother. Father called the police, and when they arrived the situation de-escalated.

When the parties again came before the juvenile court for the continued jurisdiction and disposition hearing, the Department offered its reports into evidence and rested. Counsel for B.W. introduced a handwritten letter from B.W. to the court in which B.W. asked the court to convey her love to Mother but said she wanted to live with Father. B.W.'s letter also stated: "I don't like DeJohn. He hurt my mom too much. He said he will kill me, my mom, my dad, my [paternal Grandmother]. I don't want to go over [sic] my mom." B.W.'s attorney also related, however, her own observation that B.W.'s demeanor had changed since being placed with Father (becoming more fearful)

---

[3]  More precisely, the record indicates the temporary order was dissolved by the South Compton court that issued it because Mother had not provided sufficient facts to prove her case.

and noted "some concern that [B.W.] was privy to a lot of negative information about her mother that had changed her complete demeanor."

Mother opted to testify at the jurisdictional hearing. She admitted she and Dejohn engaged in an altercation as alleged, and she further agreed that the episode had placed B.W. at risk because there was "nothing I can do to keep me and her from harm at that time because it was like we were basically being held hostage in the house." When asked why she initially told the social worker there had been no altercation with Dejohn, Mother claimed she did so because B.W. was at home when the social worker asked. Mother agreed, however, it would be confusing for B.W. to hear Mother deny the altercation had occurred. Mother further testified she had made attempts to get a restraining order against Dejohn "since the last court date," but her attempts had been unsuccessful. She claimed she had been staying away from Dejohn, and when asked why Dejohn was present at the last court hearing if she had no contact with him, Mother said she asked him to be there, via a phone call to Dejohn's mother, because she wanted the juvenile court to issue a restraining order against him and believed he had to be present for that to happen.

The juvenile court found the evidence presented "certainly satisfies the requirements" of section 300, subdivisions (a) and (b) because there was a history of domestic violence that had not been addressed and that put B.W. at risk. The court acknowledged Mother sought restraining orders against Dejohn but noted she did so only after becoming aware the Department was bringing the matter to court, rather than immediately after the altercation in June 2015. The court further found that there were "parts of [Mother's] testimony that [it] found credible, but . . . actually, there were a few lies in the testimony." Pointing to Dejohn's earlier presence in court, the juvenile court stated "[i]t is very unclear what your remaining relationship with him is" and noted it was unsure whether Mother had cut off her relationship with him such that B.W. would be protected in the future. Believing continued jurisdiction was warranted to ensure Father was not alienating B.W. from Mother, the court rejected the Department's recommendation to close the case with a custody order and instead ordered B.W.

7

removed from Mother's custody and placed her with Father, with visitation for Mother and counseling services for both parents.

## II. DISCUSSION

Mother's concession that the findings against her under section 300, subdivision (b)(1) are sufficient to establish juvenile court jurisdiction—and her failure to articulate any concrete harm flowing from the subdivision (a) finding—obviates any need to consider Mother's contention that there is insufficient evidence supporting the finding under section 300, subdivision (a). Nevertheless, for the benefit of the parties, we will briefly highlight the evidence that would compel rejection of her contention under the applicable standard of review even if we were to fully analyze it on the merits.

### A.      *We Need Not Consider Mother's Contention on Appeal*

Mother agreed while testifying at the jurisdiction hearing that her failure to protect B.W. placed her at risk of harm, and she concedes on appeal that the juvenile court's jurisdiction finding under section 300, subdivision (b)(1) was proper.

Where a dependency petition alleges multiple grounds on which the juvenile court may assert jurisdiction over a minor, we may affirm the juvenile court's finding of jurisdiction if any one of the statutory bases enumerated in the petition is supported by substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773 [reviewing court need not consider, in such a case, whether other alleged statutory grounds are supported by the evidence] (*I.J.*); *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; see also *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491 [dependency law's primary concern is the protection of children].) That is precisely the situation here. We therefore need not consider the sufficiency of the evidence to support the juvenile court's subdivision (a) jurisdictional finding.

Mother nevertheless asks us to exercise our discretion to decide her challenge to the subdivision (a) finding on the merits, asserting we may do so under *In re Drake M.* (2012) 211 Cal.App.4th 754 (*Drake M.*) and *In re Jonathan B.* (2015) 235 Cal.App.4th

115 (*Jonathan B.*). *Drake M.* holds a reviewing court may consider a challenge to a jurisdictional finding, even if there exists another uncontested finding, where "the [challenged] finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant] beyond jurisdiction' [citation]." (*Id.* at pp. 762-763.)

The grounds for exercising discretionary review envisioned in *Drake M.* are not present here. Mother does not oppose the court's dispositional order. Mother will be an "offending" parent under the petition's subdivision (b)(1) count regardless of the outcome of her appeal as to subdivision (a). (Compare *Drake M.*, *supra*, 236 Cal.App.4th at p. 763 ["Here, the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent. Such a distinction may have far reaching implications with respect to future dependency proceedings in this case and father's parental rights"].) And Mother has not specified how the subdivision (a) finding, assuming it were erroneous, might prejudice her in the future. (See, e.g., *In re I.A.*, *supra*, 201 Cal.App.4th at p. 1493 [declining to consider father's challenge to a jurisdictional finding where he did not "suggest[ ] a single specific legal or practical consequence from this finding, either within or outside the dependency proceedings"].)

Indeed, the gist of what Mother musters in support of her belief that the subdivision (a) finding will prove prejudicial is her assertion that the finding "may be used against her in further dependency proceedings" and "must be addressed by this Court due to this inherent prejudice." Of course, this does nothing more than repeat words found in the *Drake M.* and *Jonathan B.* opinions. (See, e.g., *Jonathan B.*, *supra*, 235 Cal.App.4th at p. 119 ["Because the finding that mother intentionally hurt and neglected her children may be used against mother in future dependency proceedings, we reach the merits of mother's appeal"].) If mere incantation of these words were all that is necessary to prompt reviewing courts to exercise their discretion to reach a challenged

9

jurisdictional finding when there are other findings that are sufficient, the *Drake M.* and *Jonathan B.* "exception" would swallow the *I.J.* "rule."

We believe more is necessary. In our view, the relevant sentence from the *Jonathan B.* opinion is merely the Court of Appeal's statement of its conclusion, i.e., that the record in that case and the parties' briefing convinced the court there was some prejudice that warranted reaching the merits of the subdivision (a) jurisdictional finding. That a different panel of this Court reached such a conclusion in that case does not relieve Mother of the obligation to make an effort to provide some specificity concerning how the subdivision (a) finding is likely to be prejudicial or consequential on *this* record (in a way that the subdivision (b) finding is not) such that our examination of the issue is warranted. She has not done so.

> **B.** **We Would Uphold the Subdivision (a) Finding Under the Applicable Standard of Review**

Although we need not address the evidentiary support for the juvenile court's subdivision (a) finding because the juvenile court's subdivision (b)(1) finding is undisputedly proper, we briefly describe why Mother's contention of error would not succeed. (*In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451 [affirming finding of jurisdiction over minor because the father did not challenge the domestic violence allegations but "not[ing]" the court's view on the challenged finding "for [the] Father's benefit"].)

Section 300, subdivision (a) authorizes a juvenile court to assume jurisdiction over a child when that "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."[4] We review a challenge to the sufficiency of the evidence in support

---

[4] The statute further states "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of

10

of a finding under that subdivision for substantial evidence. (*I.J.*, *supra*, 56 Cal.4th at p. 773 [court does not reweigh evidence but instead reviews whole record in light most favorable to the judgment below to determine whether a reasonable trier of fact could find the juvenile court's order appropriate].)

Under the applicable standard of review, there are sufficient facts in the record to support a finding B.W. is a child described by subdivision (a). *In re Giovanni F.* (2010) 184 Cal App.4th 594 stands for the proposition that, in some instances, a child's exposure to domestic violence can be a basis for a subdivision (a) finding even where the child is not harmed during the violent incident. (*Id.* at p. 599.) Where there is substantial evidence of a substantial risk that a parent will nonaccidentally expose his or her child to violence perpetrated by another in the child's presence, that may support a finding under subdivision (a), as even the case on which Mother principally relies, *Jonathan B.*, implicitly acknowledges. (*Jonathan B.*, *supra*, 235 Cal.App.4th at pp. 120-121 [distinguishing *In re Giovanni F.* because the father's violent conduct in that case was "entirely foreseeable"].)

Here, viewing the evidence in the light most favorable to the jurisdictional findings, Mother and Dejohn had a history of domestic violence before the June 18, 2015, altercation, including the prior 911 call and the incident in the barbershop disclosed by B.W. That history arguably made the June 18, 2015, attack foreseeable. But that is not the only evidence in the record. Mother also denied that attack happened when the Department inquired, and, as the juvenile court observed, there were indications she continued to have contact with Dejohn. The totality of the evidence therefore provided a basis to conclude there was a substantial risk Mother would continue to expose B.W. to Dejohn, and his apparent propensity for violence, even after the June 18 altercation.

We recognize the difficulty victims of domestic violence often face in escaping that violence, and we do believe the subdivision (b) finding made by the juvenile court

these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).)

was on much firmer footing.  But on these facts, the line separating section 300 subdivisions (a) and (b) becomes thin.  If we believed we should exercise our discretion to consider Mother's claim, we would conclude there is substantial evidence B.W. was at risk of serious physical harm inflicted nonaccidentally through Mother's actions.  (*I.J.*, *supra*, 56 Cal.4th at p. 773 ["'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court'"].)

## DISPOSITION

The juvenile court's order is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.



We concur:



TURNER, P.J.



KRIEGLER, J.



12